STATE of Missouri, Respondent,

v.

Tony S. PONDER, Appellant.

No. 21051.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 1, 1997.

Motion for Rehearing and Transfer to Supreme Court Denied Aug. 25, 1997.

Application to Transfer Denied
Sept. 30, 1997.

Kerry G. Rowden, Tuscumbia, Timothy R. Cisar, Lake Ozark, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Christine M. Blegen, David S. Cosgrove, Asst. Attys. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Defendant, Tony S. Ponder, was tried by jury for murder in the second degree. § 565.021.1(1).[1] In addition to submitting that charge to the jury, the trial court gave the jury a verdict-directing instruction submitting involuntary manslaughter. § 565.024.1(1). The jury found Defendant guilty of involuntary manslaughter and assessed punishment at seven years' imprisonment. The trial court entered judgment per the verdict.

 Defendant appeals. One of his eight points relied on avers the trial court erred in denying his motion for judgment of acquittal at the close of all the evidence. In addressing that issue, we view the evidence, together with all reasonable inferences drawn therefrom, in the light most favorable to the verdict and disregard all evidence and inferences to the contrary. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). Our review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found Defendant guilty beyond a reasonable doubt. *Id.*

The victim was Zachary Shelton. He was born January 1, 1992. He died September 20, 1994, as a result of injuries he sustained September 14, 1994.

Viewed favorably to the verdict, the evidence revealed that Zachary's mother, Rhonda Shelton, began cohabiting with Defendant in January, 1994. On September 13, 1994, they commenced moving from Dixon to the "Ruby Wilson farm" situated "at the western edge of Maries County."

The next day (September 14), while Rhonda was at work in Rolla, Zachary was at the home of his paternal grandparents, Marie and Edward Shelton. Around 2:05 p.m., Defendant arrived there in his pickup. He told Marie that Rhonda would be working late and she wanted him to pick up Zachary.

Marie told Zachary to go with Defendant. According to Marie, Zachary "didn't want to go." Marie's testimony:

"Q (by [Prosecutor]) What did you observe, if anything, as far as Zachary's behavior which suggested to you that he did not want to go with the Defendant?

[Defendant's lawyer]: Objection.

[Prosecutor]: Nothing about what he said.

[Defendant's lawyer]: I object to the form of the question.

THE COURT: Overruled.

THE WITNESS: He acted afraid. He started shaking and crying. He pulled away from Mr. Ponder.

Q (by [Prosecutor]) Okay. But nonetheless, Zach and Mr. Ponder left your house—is that correct?

A Correct.

Q All right. Did you ever see the Defendant again that day?

A Later that evening, around 5:50.

Q And tell the jury what happened around 5:50.

A He returned to my house around 5:50 that evening and he came to the door and said, 'Zachary has been hurt bad. He got into an electric fence.' "

Asked whether Defendant said he had thrown Zachary, Marie answered, "He said he had pulled him loose from the fence."

Marie went to Defendant's pickup. Zachary "was laying up in the passenger side." His eyes were partially open and "dry-looking." There were two marks on his right ear and a red mark "up in his hairline." He "went into a seizure and there was liquid running [out] of his mouth."

Marie ran back into the house and awoke Edward. She and he took Zachary to Phelps County Regional Hospital in Rolla, unaccompanied by Defendant.

Jay Crump, an emergency room physician, commenced treatment for Zachary. Zachary had stable vital signs but was unresponsive to stimuli and was in a coma. Crump found

---

**1.** References to statutes are to RSMo 1994.

a bruise on Zachary's right forehead and was concerned that Zachary had a head injury.

Marie told Crump that Zachary "had gotten ahold of a cattle containment fence, had been fixed to the fence and had to be knocked off." Crump looked for injuries consistent with that explanation, but found none.

After the initial evaluation, Crump decided Zachary should be transferred to St. Louis Children's Hospital because no physician at the Rolla hospital was capable of treating Zachary for a significant central nervous system injury. By that time (around 8:30 p.m.) Rhonda had arrived at the Rolla hospital. She consented to the transfer.

Meanwhile, Defendant had returned to the Ruby Wilson farm. Around 6:00 or 6:30 p.m., Roy Carmack stopped there to ask Defendant whether he wanted to accompany him (Carmack) to a sale barn. Defendant told Carmack he was waiting on Rhonda because "Zach had gotten on the fence" and he (Defendant) had "pulled him off of it."

The fence to which Defendant referred had been installed in May, 1994, by William Hale. Hale testified that the owner of the farm allowed him to pasture cattle there. In return, Hale was responsible for upkeep.

The house on the farm (into which Defendant, Rhonda and Zachary were moving) was surrounded by a yard. Hale installed the fence to keep cattle out of the yard.

The fence consisted of a single wire connected to insulated posts. The wire was energized by a "fencer"—a box mounted on the wall of the house. The box "plugs into 110 current." The fence was a "pulsating" fence, i.e., the current went through the fence at intervals of "about every one and a third second." However, the current was "off longer than it's on." That is, the fence was energized "a fraction of the time and then off."

Hale avowed he had touched the fence while it was "plugged in" and had never suffered any injury. His hand never got stuck to it.

Edward Shelton (Zachary's grandfather) testified that upon leaving the Rolla hospital

September 14 (inferably after Zachary departed for St. Louis), he (Edward) went home. Later that evening, he went to the Ruby Wilson farm because he "wanted to check that fence." Edward grasped it and "all [he] got was a tingle." He recounted, "[T]here was current coming through it, but very little.... [I]t was coming and going." He had no difficulty getting loose from the fence.

Upon Zachary's arrival at St. Louis Children's Hospital, he was examined by Bruce Kaufman, a pediatric neurosurgeon. A computed tomography revealed swelling in the left hemisphere of the brain. One area of swelling was in the left parietal occipital region; another area of swelling was in the left frontal parietal region.

Zachary also had multiple bilateral retinal hemorrhages. The most common cause of retinal hemorrhage in children is shaking, but the condition can also result from direct trauma to the head. Additionally, Zachary had a small right front scalp contusion and bruising to the right ear and neck.

Kaufman testified that Zachary's injuries, in the aggregate, were inconsistent with being shaken two or three times and also inconsistent with "an eight foot toss into grass."

Rhonda went to St. Louis Children's Hospital to be with Zachary. Late that night (September 14) she talked with Defendant by phone. He told her Zachary "grabbed the fence and was screaming and he went and pulled him off of the fence." Defendant did not say he threw Zachary to the ground or that he (Defendant) shook Zachary.

The next morning, Rhonda again talked with Defendant by phone. She told him the doctors found no indication of shock and they said Zachary was shaken. Defendant replied he might have shaken Zachary because "when he pulled him off the fence, he was unconscious and that he might have shaken him."

That afternoon (September 15), deputy sheriff Doug DiNatale interviewed Defendant. After DiNatale advised Defendant of

his Miranda rights,[2] Defendant told DiNatale he was working in the yard at the residence into which he, Rhonda and Zachary were moving. Defendant recounted he told Zachary to stay away from the fence. Despite the warning, Zachary got in contact with the fence. Defendant ran to Zachary and pushed him away from the fence. Zachary fell. While on the ground, Zachary was making noises. Defendant picked Zachary up, shook him once or twice in an effort to revive him, then drove him to the Shelton residence. Defendant did not say he threw Zachary.

After the interview, DiNatale did not arrest Defendant.

The next day (September 16), Defendant met DiNatale and other officers at the site where Zachary was injured. Defendant reenacted the incident; the reenactment was videotaped.

As reported in the third paragraph of this opinion, Zachary died September 20. The following day, an autopsy was performed by Philip Burch, Deputy Chief Medical Examiner for the City of St. Louis. Burch, a forensic pathologist, explained that his office examines all violent deaths where the deceased is pronounced dead in that city.

Zachary's body weighed 54 pounds. Burch saw no bruise on the forehead and none on the right ear. However, beneath the surface of the skin Burch found a contusion on the left side of the forehead and another contusion above and behind the left ear. He also found blood in the subdural space and subarachnoid hemorrhages on the surface of the brain. Burch observed "evidence of brain swelling and brain death."

Burch also discovered retinal hemorrhages, i.e., bleeding into the tissues of the eye away from blood vessels. Such hemorrhages can be caused by violent impact to the head or shaking.

Burch determined that the cause of Zachary's death was closed head blunt trauma. He explained, "That means that in some manner blunt trauma was transmitted to this child, specifically in the head area, and this blunt trauma was of such violent nature that it caused disruption of the brain function and ultimately in the child's death."

Prior to trial, Burch viewed the videotape of Defendant's reenactment of the incident. During Burch's testimony, this dialogue occurred:

"Q ... Can you tell us within a reasonable degree of medical certainty whether or not Zachary's injuries are consistent with the Defendant's account?

A Not all of them—no.... [H]is story would not account for the death as I— explanation of death as I see it here.

Q And why is that, Doctor?

A There is blunt trauma to the head that was grossly observable and there was evidence of blunt injury inside the head, which could be explained either by very violent shaking or by impaction of the head. What ... I saw in the video tape was a depiction of a child being tossed on a grassy slope—a very grassy covered area. The way the toss was described in the video tape is not consistent with causing very serious injury to the child. However, the man did say that he shook the child greatly in an effort to revive the child. Some of ... the injuries could be consistent with that shaking, but there would also have to be a very violent impact to the head in connection with this to explain the death here."

Douglas Beal, a pediatrician and member of the State Technical Assistance Team—a unit that assists local authorities in investigating child fatalities and abuse—reviewed Zachary's medical records from the two hospitals where Zachary was treated. Beal also reviewed the autopsy report and the videotape of Defendant's reenactment.

Beal noted Zachary had a bruise on the back side of the right ear. According to Beal, it was the type of bruise that typically occurs where an ear is pinched and pulled, or from a direct impact such as a slap or strike. Beal saw no evidence that Zachary had been electrocuted.

Beal avowed it was his opinion, within a reasonable degree of medical certainty, that Defendant's account of the incident "is not

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

accurate and does not explain the severe injuries that were suffered by Zachary." It was also Beal's opinion, within a reasonable degree of medical certainty, that "Zachary died from fatal child abuse."

The State presented testimony by an employee of "MFA in Vienna" who repairs electric fences. He examined the fence in issue on September 16 (two days after Zachary was injured) and determined its voltage was within the proper range.

The State also presented testimony by a professor of electrical engineering. In the professor's opinion, a person could not be stuck to the fence to the extent that he would be unable to let go. That is because the current pulsates, and as soon as the current is removed, the muscle is released. Consequently, there is no possibility of musculature tetanus, a condition where muscles seize and fail to function properly. The professor avowed that if the fence was in proper working order, an 18.5 pound child with "perfect contact" with the fence would not be harmed. However, the professor conceded on cross-examination that it is theoretically possible for a person to grasp the fence and be unable to let go if musculature tetanus occurs.

In setting forth the evidence thus far, we have omitted evidence favorable to Defendant. That is because, as emphasized earlier, in resolving Defendant's challenge to the sufficiency of the evidence, we view it in the light most favorable to the verdict. *Silvey*, 894 S.W.2d at 673. Evidence favorable to Defendant is recounted hereafter to the extent necessary in adjudicating the claims of error.

■ Defendant's second point, which we address first, avers the trial court erred in denying Defendant's motion for judgment of acquittal at the close of all the evidence in that the evidence (1) did not establish how Zachary's death occurred, and (2) demonstrated that death could have occurred by accident, as described by Defendant.

In regard to the latter contention, Defendant told the jury that while he was "knelt down" burning trash, he heard Zachary scream. Defendant looked toward Zachary and saw he "had ahold of that electric fence" with both hands. Defendant avowed he ran to Zachary and tried to get him off the fence. Zachary "was stomping around and just kept hollering."

Continuing his narrative, Defendant stated he got one of Zachary's arms loose, but then Zachary "got to struggling with me and got his head up under the wire." At that point, explained Defendant, "I grabbed ahold of the back of his hair and I pushed down ... and I pulled back, he give and I threw him backwards." That freed Zachary from the wire.

Defendant testified he did not see Zachary land. After kneeling to catch his breath, Defendant turned and saw Zachary lying on his side and shaking. Upon seeing that, said Defendant, "I went over there and I picked him up and hollered his name and he wouldn't answer and then that's when I shook him."

Citing *State v. May*, 689 S.W.2d 732 (Mo. App. W.D.1985), Defendant argues that the State had to prove Zachary's injuries could not have occurred in the manner described by Defendant, and no doctor testified the injuries could not have occurred that way.

*May* is like the instant case in that the victim, a child, died from a brain injury several days after the injury occurred. *Id.* at 734–35. However, Defendant's reliance on *May* is misplaced, as the evidence there was significantly different than the evidence here.

In *May*, the medical experts testified they could not determine whether the fatal injury was caused by a fall or by the victim being struck by someone. *Id.* at 735. Furthermore, the evidence failed to establish when the fatal injury occurred and likewise failed to demonstrate that the accused was alone with victim when the injury occurred. *Id.* at 736–37.

The appellate court (in a two-to-one decision) reversed a manslaughter conviction, saying:

"There was no evidence that the mortal injury was administered by a human and that the defendant was that person. The proofs allow no clue, either to an expert or to a lay person as to the cause of death, except to choose between two equal possibilities—a fall or a blow. Where the evi-

dence allows no more than equal support for either of two inconsistent inferences as to an ultimate and determinative fact, there is a failure of proof beyond a reasonable doubt."

*Id.* at 736.

In contrast, the evidence here conclusively established that the injuries which caused Zachary's death occurred between 2:05 p.m. and 5:50 p.m., September 14, 1994, while Zachary and Defendant were alone together. Additionally, the evidence conclusively established that Zachary's injuries did not occur while Defendant was a bystander. Defendant told the jury under oath that Zachary was injured during an incident in which Defendant participated. What the jury had to decide was whether the incident occurred as Defendant described it—an "accident" according to Defendant—or whether Defendant inflicted the injuries by conduct different than his sworn account.

On that subject, there was ample evidence to support a finding that Zachary did not become stuck to the fence (as Defendant avowed). No physician saw evidence of electrical burn on Zachary's hands, and the State's evidence showed that anyone grasping the fence could easily release it.

Additionally, Defendant's initial account of the incident (to Roy Carmack and Rhonda) was that he had merely pulled Zachary off the fence. Only after Rhonda told Defendant that the doctors found no indication of shock and said Zachary was shaken did Defendant say he shook Zachary.

Furthermore, the record refutes Defendant's proclamation that no medical expert testified Zachary's injuries could not have occurred in the manner described by Defendant. As we have seen, Dr. Kaufman testified the injuries, in the aggregate, were inconsistent with Zachary being shaken two or three times and also inconsistent with "an eight foot toss into grass." Dr. Burch determined that the cause of death was closed head blunt trauma of violent nature. According to Burch, Defendant's reenactment of the incident would not account for all of Zachary's injuries. That opinion was shared by Dr. Beal, who likewise viewed the videotape of Defendant's reenactment and con-

cluded it did not explain the severe injuries suffered by Zachary. In Beal's opinion, Zachary died from fatal child abuse.

■ Defendant reminds us that a medical expert retained by him testified there was nothing in the evidence that "disproves" Defendant's account of the incident. However, the jury was not obliged to believe Defendant's expert. A jury may believe all, part or none of the testimony of any witness. *State v. Porter,* 640 S.W.2d 125, 127 (Mo. 1982). The jury had the right to believe the testimony adduced by the State and reject the testimony offered by the defense. *Id.*

Both the majority and dissenting opinions in *May* discuss cases where homicide convictions were affirmed in circumstances where a child was fatally injured while alone with the accused. 689 S.W.2d at 737–39 and 742–43. The evidence in the cases discussed there was analogous to the evidence in the instant case. *Compare: State v. Applegate,* 668 S.W.2d 624 (Mo.App. S.D.1984).

We hold the evidence sufficient to support a finding, beyond a reasonable doubt, that Zachary's fatal injuries were inflicted by Defendant, that Defendant inflicted the injuries by an intentional act or acts, and that Defendant did not inflict the injuries accidentally during an attempt to extricate Zachary from the fence. Defendant's second point is denied.

■ We next consider Defendant's first point. It avers the trial court erred in giving Instruction 9, the verdict-directing instruction submitting involuntary manslaughter. Defendant maintains: "[T]here was insufficient evidence to submit this case to the jury on the basis of 'recklessness' in that there was no evidence, direct or circumstantial, on how [Defendant] acted recklessly; the State argued it's [sic] evidence established [Defendant] acted intentionally in assaulting the deceased, the [Defendant's] evidence was that the death was an accident."

Instruction 9 (MAI–CR 3d 313.10) reads, in pertinent part:

"If you do not find the defendant guilty of murder in the second degree, you must

consider whether he is guilty of involuntary manslaughter.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about the 14th day of September, 1994, in the County of Maries, State of Missouri, the defendant caused the death of Zachary Shelton by striking or throwing or shaking him, and

Second, that defendant recklessly caused the death of Zachary Shelton,

then you will find the defendant guilty of involuntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of involuntary manslaughter.

In determining whether the defendant recklessly caused the death of Zachary Shelton, you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk that he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances."

The State's theory, as presented to the jury in final argument, was that Defendant became irked because Zachary ignored Defendant's repeated warnings to stay away from the fence. Consequently, said the prosecutor, Defendant hit Zachary four times on the head.[3] Furthermore, added the prosecutor, "there could have been shaking as well ... we can't tell you which one made his brain stop working." The prosecutor told the jury that the evidence refuted Defendant's testimony that he accidentally injured Zachary while attempting to free him from the fence.

Consistent with the jury argument, the State, in response to Defendant's first point on appeal, maintains the submission of involuntary manslaughter was proper in that reasonable jurors could have found that Defendant, "angered by the fact that Zachary would not stay away from the fence, used excessive force on a two and a half year old child." Accordingly, says the State, "While not intending to injure or kill Zachary, [Defendant] consciously disregarded a substantial and unjustifiable risk that striking and violently shaking a two and a half year old child would cause the child to die from brain injuries."

Defendant insists that the State's hypothesis of the incident does not establish that he was "reckless" within the meaning of § 565.024.1(1). In Defendant's words, "One cannot beat a child 'recklessly' in the legal sense." In support of his position, Defendant cites *State v. Albanese*, 920 S.W.2d 917 (Mo.App. W.D.1996), and *State v. Hamlett*, 756 S.W.2d 197 (Mo.App. S.D.1988).

In *Albanese*, the accused was convicted of voluntary manslaughter. § 565.023. 920 S.W.2d at 920. One of his complaints on appeal was that the trial court erred in refusing to instruct the jury on involuntary manslaughter. *Id.*

The State's evidence in *Albanese* was that during an altercation between the accused and the victim, the accused inflicted the fatal injury by stabbing the victim in the heart with a knife. *Id.* at 921–22. The accused's testimony was that during the altercation, he was grabbed and punched by the victim's companions, whereupon he grabbed the knife and "lashed out recklessly." *Id.*

Rejecting the accused's claim of error, the court explained:

"Involuntary manslaughter results from consciously *disregarding* a substantial and *unjustifiable risk* of injury to another. It is a reckless act that results in the unintended death of another person. Here, however, while Mr. Albanese may have characterized his manner of swinging the knife as 'reckless,' it was not reckless in the legal sense, for he specifically intended to lash out with his knife in the very manner in which he did intending to create a substantial risk of causing death or serious physical injury to his purported attackers. While he may not have formed a specific intent to kill the victim, he thus intended to use deadly force and must

3. The prosecutor attempted to connect each blow to an injury shown by the evidence.

have known that in so doing he might kill the person against whom he used the knife, as occurred here."

*Id.* at 925[20] (emphasis in original).

In *Hamlett*, the accused was convicted of voluntary manslaughter. § 565.023. 756 S.W.2d at 198. One of his complaints on appeal was that the trial court erred in refusing to instruct the jury on involuntary manslaughter. *Id.*

The evidence, viewed favorably to the accused's claim of error, was that he kicked the victim in the throat (the accused was wearing western boots), then hit the victim three or four times on the side of the head with his fist, kicked the victim again, then hit the victim approximately two more times. *Id.* at 200.

Rejecting the accused's claim of error, this court held:

"[The accused's] attack on [the victim] was deliberate, not accidental, and even if [the accused], as he says, had no desire to kill [the victim], such a result followed. Since the assault, by fists and feet, was a means likely to produce death, [the accused] is presumed to have intended that death would follow his acts."

*Id.* at 200–01.

Defendant cites two other cases in support of his first point; however, they are too factually different from the instant case to warrant discussion.

After briefing was completed in this appeal, this court decided *State v. Frappier,* 941 S.W.2d 859 (Mo.App. S.D.1997). There, the accused was convicted of involuntary manslaughter of his three-month-old son. *Id.* at 860. An autopsy showed the victim's brain was swollen, a condition commonly caused by lack of oxygen, and that he had "metabolic acidosis" which results from a lack of breathing. *Id.* The doctor who performed the autopsy concluded the victim died from asphyxiation (lack of oxygen). *Id.*

A witness who shared a jail cell with the accused testified the accused said he had become frustrated with the victim's crying and had picked him up by his neck, shaken him and thrown him down. *Id.* The witness quoted the accused as saying he was unable to recall everything he did, but he came back later to find the victim pale and cold. *Id.* at 860–61.

On appeal, the accused maintained—as does Defendant in the instant appeal—that there was no evidence he acted recklessly. *Id.* at 860. The accused argued that the State's evidence showed the accused asphyxiated the victim by squeezing his neck with both hands for three to four minutes, and such evidence could support only a finding that the accused acted intentionally, not recklessly, in causing the victim's death. *Id.*

This court held it was possible to infer that the accused did not intentionally choke the victim, but tried to quiet him by holding his neck and thereby asphyxiated him. *Id.* at 861. The opinion said:

"A reasonable juror could determine that there was a substantial and unjustifiable risk that quieting [the victim] in this manner would cause [his] death and that [the accused's] conscious disregard of that risk was a gross deviation from what a reasonable person would do under the circumstances.... [The accused] may not have intended the act, i.e., asphyxiating [the victim], which caused death. The jury ... could have found that [the accused] was trying to quiet rather than kill the child, but in doing so acted recklessly, causing the child's death. There was sufficient evidence to sustain a conviction for involuntary manslaughter[.]"

*Id.* at 861–62.

The instant case, while not factually identical to *Frappier,* is nonetheless analogous. The jury could have reasonably found that Defendant caused Zachary's injuries upon becoming frustrated with Zachary (like the accused in *Frappier* ), that Defendant used only his hands in inflicting the injuries (like the accused in *Frappier* ), that although Defendant meant to hit—or shake or toss—Zachary, Defendant's purpose was only to compel Zachary to heed Defendant's warnings about the fence, and that Defendant (like the accused in *Frappier* ) did not intend to cause death or serious physical injury.

The jury could have further found that by hitting a child of Zachary's age and size on

the head several times (and perhaps shaking him violently or tossing him away from the fence), Defendant consciously disregarded a substantial and unjustifiable risk that he would cause Zachary's death, and that such disregard was a gross deviation from what a reasonable person would do in such circumstances. That was the hypothesis submitted by Instruction 9.

The instant case is not governed by *Albanese*, 920 S.W.2d 917, in that the accused there inflicted the fatal injury by lashing out at the victim with a knife, a weapon likely to kill or cause serious physical injury. The instant case is likewise not governed by *Hamlett*, 756 S.W.2d 197, in that the accused there kicked the victim in the throat with a boot-clad foot, hit the victim numerous times, and kicked him again. This court held that assault, by fists and feet, was a means likely to produce death and the accused was presumed to have intended that death would follow his acts. *Id.* at 200–01.

Recognizing the issue is excrutiatingly close, we hold it was a jury question whether Defendant caused Zachary's death by acting recklessly within the meaning of § 565.024.1(1), but without intent to cause death or serious physical injury. Consequently, the trial court did not err in giving Instruction 9. Defendant's first point is denied.

Defendant's third point has three components. The first avers the trial court erred in receiving evidence of the "state of mind" of Zachary. Because the point does not identify the specific evidence toward which the point is directed, we have searched the argument following the point for guidance. In the argument, we find a reference to a segment of Rhonda's testimony where the prosecutor asked her to give the jury her impression of "how Zachary felt about the Defendant."

Defendant's lawyer objected that Rhonda's impression was irrelevant. Defendant's lawyer continued, "If he wants to ask specific things that Zach did, we have no objection to that, but asking this witness her impression of how Zach felt, we've already filed a motion in limine on that and I believe it's already been sustained."

The prosecutor replied, "The victim's state of mind with regard to the Defendant is admissible when the Defendant raises the defense of accident and he has done so[.]"

The trial court overruled the objection, whereupon Rhonda testified:

"He didn't seem to care for being around him. At first he was—when we weren't living together, Zach seemed to like him and everything and then he started acting funny. He wouldn't want to go home with me or anything, because I'd pick him up at my grandma's and he'd cry and scream and he wouldn't want, you know, Tony to hold him or nothing. He just didn't want to be around him."

Our first observation is that Rhonda's answer described specific conduct of Zachary, i.e., crying and screaming when Rhonda arrived at her grandmother's to pick him up. Defendant's lawyer clearly told the trial court he had no objection to "specific things that Zach did." The only portion of Rhonda's answer constituting her "impression" of how Zachary felt about Defendant was her testimony that Zachary did not seem to want to be around Defendant and did not want Defendant to hold him.

Our second observation is that there is a line of cases discussing instances where evidence of a victim's state of mind is admissible. *State v. Boliek*, 706 S.W.2d 847 (Mo. banc 1986), *cert. denied*, 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986); *State v. Post*, 901 S.W.2d 231 (Mo.App. E.D.1995); *State v. Pagano*, 882 S.W.2d 326 (Mo.App. S.D.1994); *State v. Reagan*, 654 S.W.2d 636 (Mo.App. E.D.1983); *State v. Singh*, 586 S.W.2d 410 (Mo.App. S.D.1979). The State's brief asserts that inasmuch as Defendant claimed Zachary's death was accidental, evidence that Zachary feared Defendant was admissible.

■ As explained in *Post*, 901 S.W.2d at 235–36, evidence of a deceased victim's state of mind toward the accused may be relevant when, *inter alia*, the accused is the actor who causes the death and the accused claims the death was accidental. However, in the instant case the State fails to explain how

Zachary's state of mind toward Defendant, as described by Rhonda, rebuts Defendant's claim of accident.

Had the State's theory been that Zachary was so fearful of Defendant that Zachary would have scrupulously obeyed Defendant's warnings to stay away from the fence (thereby demonstrating Defendant was lying when Defendant told DiNatale that Zachary touched the fence despite Defendant's warnings), Rhonda's testimony as to how Zachary "felt" about Defendant could have arguably been relevant to refute Defendant's account of the incident. However, as we have seen, the State's theory was that Zachary did not heed Defendant's warnings, and that Zachary's disobedience irked Defendant, triggering Defendant's conduct that caused Zachary's death. We therefore fail to envisage how Zachary's state of mind toward Defendant was relevant. However, for the reasons below, we need not decide the relevancy issue.

■ In addressing alleged trial court error, an appellate court reviews for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the accused of a fair trial. *State v. Tokar,* 918 S.W.2d 753, 761[1] (Mo. banc 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

As noted near the start of our account of the State's evidence, Marie Shelton testified that when she told Zachary to go with Defendant on the fatal day, Zachary acted afraid, began shaking and crying, and pulled away from Defendant. The only objections by Defendant's lawyer to that testimony were: "Objection," and "I object to the form of the question."

■ It is uniformly held in Missouri that specific objections to evidence are required, and the objection must call the attention of the trial court to the ground or reason for the objection. *State v. Lang,* 515 S.W.2d 507, 511[6] (Mo.1974). There, the Supreme Court of Missouri held nothing was preserved for review when the accused's lawyer said, "Objection," during a comment by the prosecutor in closing argument. *Id.* at 511. Consistent with *Lang,* we hold Defendant's

lawyer preserved no error by saying, "Objection," during Marie's testimony.

■ We reach the same conclusion in regard to the other objection by Defendant's lawyer—"I object to the form of the question." The objection identifies no specific flaw or impropriety in the question. In that respect, the objection is like the one in *State v. Jones,* 462 S.W.2d 661, 663[2] (Mo.1971), where the accused's lawyer said, "I object to that." The Supreme Court of Missouri held the objection insufficient to preserve any issue for appellate review.

Consequently, Defendant cannot—nor does he—complain on appeal about Marie's testimony as to how Zachary reacted when told he had to go with Defendant.

Furthermore, and of greater importance, Marie testified *before* Rhonda. Marie's testimony was at least as compelling as Rhonda's in indicating Zachary did not want to be around Defendant. Yet, Defendant's brief maintains that when Rhonda was asked how Zachary felt about Defendant, "no evidence had been introduced regarding [Zachary's] state of mind up to that point in trial."

■ We reject Defendant's argument. Marie's description of Zachary's reaction upon learning he had to go with Defendant graphically illustrated Zachary's "state of mind" regarding Defendant. Therefore, Rhonda's testimony that Zachary did not seem to want to be around Defendant and did not want Defendant to hold him was merely cumulative to testimony already given by Marie.

■ If evidence is improperly admitted, but other evidence establishes essentially the same facts, there is no prejudice to the accused and no reversible error. *State v. Zagorski,* 632 S.W.2d 475, 478 n. 2 (Mo. banc 1982). Accordingly, we find no merit in the first component of Defendant's third point.

■ The second component of Defendant's third point is that the trial court erred in receiving evidence about "two minor injuries that [Zachary] had previously received while in the care of [Defendant] even though no allegations had ever been made that the

two prior minor injuries were anything other than minor accidents."

This issue arose after Rhonda, during cross-examination by Defendant's lawyer, testified:

"Q Did you ever observe—was there occasions that Tony and Zach would leave together and they would be alone together?

A About three or four times—yes.

Q And Tony would take care of him during that period that time.

A Yes.

Q Would he buy him stuff?

A Yeah, he did.

Q And did you ever see Tony strike Zach?

A No.

Q And have you ever seen Tony spank Zach?

A No.

Q And have you ever even seen Tony yell at Zach?

A No.

Q Have you ever seen Tony lose his temper with Zach?

A No."

Before redirect examination of Rhonda, the prosecutor (at sidebar) told the trial court that Defendant's lawyer, by adducing testimony from Rhonda that "things were fine [between Defendant and Zachary] when they were living together," had opened the door to evidence that Zachary was hurt on two previous occasions while alone with Defendant.

Defendant's lawyer argued he adduced Rhonda's testimony to rebut her earlier testimony that Zachary "did not like" Defendant.

The trial court agreed with the prosecutor that Defendant's lawyer "opened it up."

Thereafter, during the prosecutor's redirect examination of Rhonda, this dialogue occurred:

"Q It is not ... true that on prior occasions when Zachary left alone with the Defendant, Zachary was injured on prior occasions?

A Yes."

Rhonda was asked nothing else about those occasions.

During Defendant's testimony (later in the trial), he gave an account of two occasions when Zachary was injured. Defendant's testimony was that both incidents were childhood mishaps in which Defendant was blameless. The State presented no evidence refuting Defendant's testimony.

Defendant cites authority for the proposition that generally, evidence of uncharged misconduct by the accused is inadmissible to prove guilt of the crime charged. Defendant acknowledges the exceptions listed in *State v. Williams,* 865 S.W.2d 794, 802 (Mo.App. S.D. 1993), but maintains none of those exceptions apply here.

The State responds that on redirect examination, it is proper to question a witness on any matter which tends to refute, weaken, or remove an unfavorable inference resulting from cross-examination, even though the facts elicited might be otherwise inadmissible. *State v. Moore,* 744 S.W.2d 479, 481[5] (Mo.App. S.D.1988), *citing State v. Lingar,* 726 S.W.2d 728, 734[7] (Mo. banc 1987), *cert. denied,* 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). Accordingly, says the State, because Defendant, during cross-examination of Rhonda, endeavored to create an inference that Defendant always took proper care of Zachary, the State was allowed to refute such an inference by showing Zachary had been hurt twice while with Defendant.

We hold the receipt of Rhonda's testimony on redirect examination was not reversible error for two reasons.

First, Rhonda did not describe the earlier injuries, and nothing in her testimony demonstrated they were caused by any unlawful conduct of Defendant. Defendant's unrefuted testimony was that the injuries were childhood mishaps in which he was blameless.

 To violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other

crimes or misconduct. *State v. Stoner,* 907 S.W.2d 360, 364[11] (Mo.App. W.D.1995). Vague remarks cannot be characterized as clear evidence to associate the accused with other crimes. *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989); *Stoner,* 907 S.W.2d at 364[11].

Rhonda's testimony on redirect examination did not show Defendant committed, was accused of, was convicted of, or was definitely associated with, any other crime or misconduct regarding Zachary. Furthermore, after Defendant avowed he was blameless in the two earlier episodes, the State presented no evidence in rebuttal.

Second, inasmuch as Defendant, during cross-examination of Rhonda, endeavored to create an inference that he always took proper care of Zachary, Rhonda's testimony on redirect examination—although amorphous—arguably tended to refute that inference and was therefore admissible. *Lingar,* 726 S.W.2d at 734[7]; *Moore,* 744 S.W.2d at 481[5]. The second component of Defendant's third point is denied.

The third component of Defendant's third point charges the trial court with error in "allowing testimony of supposed assaults by [Defendant] towards Rhonda." This issue, like the previous one, arose during Rhonda's testimony.

On cross-examination, Defendant's lawyer adduced testimony from Rhonda that Defendant was not hot-tempered, but instead was calm, peaceable and mild-mannered.

During the prosecutor's redirect examination of Rhonda, this dialogue occurred:

"Q You stated that the Defendant was not hot-tempered—that he was mild-tempered.

A Yes.

Q It is not true that on two prior occasions, the Defendant lost his temper with you and assaulted you?

A Yes."

Defendant, as we understand his brief, maintains the above testimony constituted inadmissible evidence of other crimes committed by him.

The State responds that Defendant did not object to the above testimony. Consequently, says the State, any claim of error regarding it is not preserved for review.

Defendant, in his reply brief, does not dispute the State's contention.

In examining the transcript, we find no objection by Defendant to the testimony toward which the third component of his third point is directed. Consequently, we hold the third component is not preserved for review. *State v. Graves,* 588 S.W.2d 495, 499[4] (Mo. banc 1979).

■ Defendant's fourth point assigns error in the trial court's giving of Instruction 5.[4] Defendant asserts the instruction gave the jury the impression he had "committed prior offenses even though the evidence was that the two prior injuries were accidents." We infer from this averment that Defendant is referring to the two incidents toward which the second component of his third point was directed.

We reject Defendant's thesis that the instruction gave the jury the impression he had committed other offenses. The instruction began, "If you find and believe from the evidence...." That preamble clearly left it to the jury to determine whether Defendant committed any offense other than the one charged. Furthermore, the instruction cautioned the jury to consider such evidence on only the issue of absence of mistake, accident or intent.

As recognized in *State v. Crawford,* 914 S.W.2d 390, 393 (Mo.App. E.D.1996), this standard cautionary instruction is generally requested by the accused. Defendant fails to demonstrate how he was prejudiced by Instruction 5, and cites no case supporting his claim that the trial court erred in giving it

---

**4.** Instruction 5, MAI–CR 3d 310.12 (10–1–95), reads:

"If you find and believe from the evidence that the defendant was involved in offenses other than the one for which he is now on trial, you may consider that evidence on the issue of absence of mistake or accident or intent of the defendant. You may not consider such evidence for any other purpose."

over his objection. Defendant's fourth point is denied.

■ Defendant's fifth point avers the trial court erred in rejecting Instruction B—an instruction about motive—tendered by Defendant.[5] Defendant cites four cases; however, only three of them mention a motive instruction. Each of the trio was decided before January 1, 1974, the date the use of pattern instructions in criminal cases became mandatory. *See:* Order of the Supreme Court of Missouri, May 18, 1973, vol. 492–493 S.W.2d Missouri Cases, pp. XXI–XXXVI, and Order of the Supreme Court of Missouri, October 12, 1973, MAI–CR (1974), p. XIII.

The trial court gave the jury MAI–CR 3d 302.01 (1–1–87), which reads, in pertinent part:

"It is your duty to determine the facts and to determine them only from the evidence and the reasonable inferences to be drawn from the evidence. In this determination, you alone must decide upon the believability of the witnesses and the weight and value of the evidence."

The State points out that paragraph 3 of the Notes on Use for MAI–CR 3d 302.01 (revised 10–1–92) states: "Except as may be specifically provided for elsewhere in MAI–CR, no other or additional instruction may be given on the believability of witnesses, or the effect, weight, or value of their testimony."

Rule 28.02(c), Missouri Rules of Criminal Procedure (1996), reads:

"Whenever there is an MAI–CR instruction . . . applicable under the law and Notes On Use, the MAI–CR instruction . . . shall be given or used to the exclusion of any other instruction. . . ."

In *State v. Chambers,* 891 S.W.2d 93, 109[54] (Mo. banc 1994), the accused claimed the trial court erred in refusing "non-MAI instructions" tendered by the accused. The Supreme Court of Missouri, citing Rule 28.02(c), held the trial court must give the applicable MAI instructions, to the exclusion of any other instruction, hence refusal of the accused's tendered instructions was not error.

Inasmuch as Defendant's tendered Instruction B singled out motive, or the absence thereof, as an "evidentiary circumstance" for the jury's consideration, and was not patterned on an instruction in MAI–CR 3d, the State maintains the trial court committed no error in refusing to give it.

We agree. The jury was given MAI–CR 3d 302.01, which explained the duty to determine the facts from the evidence and reasonable inferences therefrom, and the task of deciding the weight and value of the evidence. The absence of a "motive" instruction in MAI–CR 3d indicates the Supreme Court of Missouri, in promulgating MAI–CR 3d, concluded no separate instruction identifying motive, or lack thereof, as an evidentiary circumstance for the jury's consideration was necessary.

Defendant cites no case since the adoption of pattern instructions in criminal cases which holds that failure to give a "non-MAI instruction" on motive is error. Furthermore, Defendant's tendered Instruction B said motive is an evidentiary fact in *murder* cases. Defendant was not convicted of murder, but of only involuntary manslaughter. Defendant fails to explain how the presence or absence of motive is relevant where an accused is convicted of recklessly causing another's death.

For the above reasons, we hold the trial court did not err in refusing to give Instruction B. Defendant's fifth point is denied.

We next consider Defendant's eighth point. It charges the trial court with error in excluding certain evidence offered by Defendant. We have inspected Defendant's motion for new trial and have found no complaint therein about the exclusion of the evidence identified in the eighth point. Consequently, the eighth point is not preserved for review.

---

5. Instruction B reads:
 "Motive is an important evidentiary fact in murder cases based on circumstantial evidence or where accident is claimed. However, motive is not an essential element of the crime of murder. The presence or absence of motive is an evidentiary circumstance to be given such weight by you as you consider it entitled to under all the circumstances."

**914**

Rule 29.11(d); *State v. Peterson*, 518 S.W.2d 1, 3[2] (Mo.1974).

That brings us to Defendant's two remaining points (his sixth and seventh). He cites no case in support of either.

The cases cited by the State demonstrate the sixth and seventh points are meritless. No jurisprudential purpose would be served by lengthening this opinion with a discussion of them. They are denied. Rule 30.25(b).

Judgment affirmed.

PARRISH, J., and MONTGOMERY, C.J., concur.