**STATE of Missouri, Plaintiff–Respondent,**

v.

**Zachary E. HARP, Defendant–Appellant.**

No. 24903.

Missouri Court of Appeals,
Southern District,
Division Two.

April 9, 2003.

Nancy A. McKerrow, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Evan J. Buchheim, Asst. Atty. Gen., Jefferson City, for Respondent.

NANCY STEFFEN RAHMEYER, Chief Judge.

Zachary E. Harp ("Appellant") appeals from his conviction by a jury of manufacturing a controlled substance in violation of § 195.211 [1], possession of a chemical with intent to create a controlled substance in violation of § 195.420, possession of a controlled substance in violation of § 195.202, and possession of drug paraphernalia with intent to use it to manufacture methamphetamine in violation of § 195.233. He was sentenced by the court as a prior and persistent drug offender under §§ 195.275 and 195.291 to concurrent terms of imprisonment of twenty years without the possibility of probation or parole for manufacturing a controlled substance, ten years for possession of a chemical with intent to create a controlled substance, ten years for possession of a controlled substance, and eight years for possession of drug paraphernalia with intent to use it to create methamphetamine.

---

1. All references to statutes are to RSMo 2000, unless otherwise indicated.

Appellant presents three points on appeal. In Appellant's first point relied on, he contends the trial court erred in admitting evidence of two thermos jugs found during a search of his grandmother's car because Appellant did not voluntarily consent to the search. In his second point relied on, Appellant claims the trial court abused its discretion in allowing the admission of evidence at trial of Appellant's physical appearance on the date he was arrested because the evidence allowed the jury to infer that Appellant was a methamphetamine addict and thus more likely to manufacture methamphetamine. In Appellant's last point relied on, he alleges that the trial court "plainly erred" in sentencing him for all four of the offenses with which he was charged because the sentences violate his right to be free from double jeopardy in that three of the offenses are actions that are part of the "continuing course of conduct" required to commit the offense of manufacturing of a controlled substance. We affirm the judgment of the trial court.

Appellant does not contest the sufficiency of the evidence; therefore, we consider the facts and all reasonable inferences therefrom in the light most favorable to the verdict and reject all contrary evidence and inferences. *State v. Rush*, 949 S.W.2d 251, 252 (Mo.App. S.D.1997). On September 22, 1999, at approximately one o'clock in the afternoon, two sewer workers for the City of Springfield were working near the alley of Summit Street. The workers detected a strong odor of ether emanating from an open manhole that was strong enough to give one of them "an instant headache." The sewer workers had been trained in identifying clandestine metham-

phetamine labs and thus knew that an odor of ether could indicate the presence of a methamphetamine lab. Believing they may have found a methamphetamine lab, the sewer workers flagged down Springfield Police Department Officer Don Mitchell ("Mitchell"), who was patrolling the area, and reported the odor of ether coming from the sewer line. The workers also reported to Mitchell that the sewer line they were working on served only four houses; therefore, the odor had to be emanating from one of those houses.

As Mitchell walked in the alley behind the four houses, he smelled a "fairly strong" odor of ether. He determined that the odor was emanating from a house located at 1518 North Summit. Based upon his training and experience, Mitchell associated the odor with the manufacturing of methamphetamine and decided to call for assistance. Springfield Police Department Officers Michael Murphy ("Murphy") and Darin Leonard ("Leonard") answered the call for assistance.

As Mitchell, Murphy, and Leonard approached the house at 1518 North Summit, the officers observed a white Ford Tempo parked at the northeast corner of the alley. When the officers arrived at the Tempo, they observed Appellant, who was carrying a laundry basket, exit the back of the house and walk towards the car.[2] Mitchell and Murphy made contact with Appellant and immediately handcuffed him; however, Appellant was not under arrest.[3] Appellant was searched for weapons but after finding none, Murphy informed Appellant he believed there was possibly a methamphetamine lab in the area because of the odor in the air. Murphy then asked Ap-

---

**2.** The officers later learned that Appellant had borrowed the Tempo from his grandmother.

**3.** Mitchell testified that based on his experience, people involved with methamphetamine

labs "are often paranoid and they either run or fight, and many have been armed in the past."

pellant if there were any other people in the house to which Appellant replied that three people remained inside. Mitchell stayed with Appellant while Murphy and Leonard entered the house.

Murphy and Leonard conducted a cursory search of the house and found Richard Stufflebean ("Stufflebean"), Melissa Murphy,[4] and Angelique McMillan inside the house. Stufflebean, Melissa Murphy, and Angelique McMillan were brought into one room and Leonard remained in the room with them while Murphy went outside to speak with Mitchell. While Murphy and Leonard were inside the house, Mitchell asked Appellant, who was still handcuffed, if he could search the Tempo and Appellant consented. Mitchell did not search the car at that time because Murphy exited the house and reported that he could not detect an odor of ether inside the house. Appellant was then released from the handcuffs.

Appellant waited at the rear of the Tempo while Mitchell and Murphy examined the area outside of the house. The officers determined that the odor of ether was emanating from a blue trash can at the north side of the house. When Mitchell opened the trash can, he immediately smelled a very strong odor of ether. Mitchell examined the contents of the trash can and found broken glass jars, a can of starter fluid, an Ocean Spray bottle with white residue inside and a hole in the lid, coffee filters, and a foot and a half long thin clear hose.[5] Most of the items in the trash can were wet or moist and the bro-

ken glass jars contained a damp, pink residue.[6]

Upon completing his examination of the trash can, Mitchell again approached Appellant and asked if he could search the Tempo. Appellant told the officer he could search the car and handed the officer the keys to the car because the car was locked. It is the consent to this search that is challenged by Appellant. Mitchell found a half-gallon and a two-gallon thermos jug in the driver's side rear floorboard during the search. Mitchell opened the thermos jugs and smelled anhydrous ammonia, which he knew was a chemical commonly used in the manufacturing of methamphetamine. Murphy continued inspecting the outside of the house and found a cooler on top of a barrel which contained a very strong odor of anhydrous ammonia. One of the officers called the Springfield Police Department Narcotics Enforcement Unit and two officers, including Officer Robert McPhail ("McPhail"), arrived at the house.

After the Narcotics Enforcement Unit officers arrived, Murphy spoke with Stufflebean in his patrol car and informed him the officers had found what they believed to be remnants of a methamphetamine lab. Stufflebean told the officer that he did not make methamphetamine, he was just "a user." Stufflebean admitted that the house was his residence and gave the officer permission to search the house. Stufflebean stated that he wanted to speak to McPhail, but not in front of Appellant or the two women.

---

**4.** Although Melissa Murphy and Officer Michael Murphy share the same surname, they are not related.

**5.** According to Mitchell a hole was made in the lid of the Ocean Spray bottle for the purpose of putting the hose inside the bottle. Murphy testified that this resulted in what is commonly called an "acid generator," which

is used in the manufacturing of methamphetamine.

**6.** According to Springfield Police Department Officer Robert McPhail, when cold pills are soaked for the purpose of removing the pseudoephedrine contained in the pill, a pink powder or residue remains.

Stufflebean told McPhail that Appellant and Angelique McMillan had been staying at the house with him and his girlfriend, Melissa Murphy. He reported that Appellant had "cooked" methamphetamine in his backyard the night before, placed the items in the trash can, and flushed the leftover liquids down Stufflebean's toilet. After the methamphetamine was finished, some people came by and either took the methamphetamine or purchased it from Appellant. Stufflebean granted permission to search his residence.

Stufflebean showed the officers an opening in the ceiling of his bathroom where the officers found a spoon with brown residue on it, some unused coffee filters, and a homemade pipe used to smoke methamphetamine. Stufflebean then told the officers that there were other items in a black bag in his brother's gray car, which was parked in the backyard. During the search of that car, McPhail found the black bag which contained items used in the manufacturing of methamphetamine including a Ziplock bag of rock salt, a bottle of "Liquid Fire", two Mason jars, quart jars of liquid, an empty one-gallon jar with a stir stick, some spoons, some coffee filters, a pipe cutter, and a bowl along with some other jar lids.

At trial, Stufflebean testified that on September 21, 1999 at about five or six o'clock in the evening, Stufflebean, Appellant, and two other men began making methamphetamine at his residence. The process was moved to another person's residence "to do the anhydrous ammonia gas on it," and then moved back to Stufflebean's residence. Stufflebean claimed he went to bed at that point because he did not want to be involved, but testified that Appellant finished the process in Stufflebe-

an's backyard. Stufflebean admitted that he provided "[s]ome ether, some Liquid Fire, some rock salt," and he "helped gather up pills or whatever else was needed." Appellant provided the anhydrous ammonia, some ephedrine pills, and lithium batteries. Appellant had kept the anhydrous ammonia in the thermos jugs and cooler found by the officers. After the methamphetamine was finished, Stufflebean put the items used to make the methamphetamine in the trash can found by the officers outside of the house. Appellant poured the leftover liquids down the shower drain in Stufflebean's bathroom and placed the black bag in Stufflebean's brother's car. Because Appellant had supplied the most difficult ingredient to obtain, anhydrous ammonia, Appellant received one-half of the methamphetamine manufactured.

■ In his first point relied, Appellant contends the trial court erred in overruling Appellant's motion to suppress the two thermos jugs and defense counsel's objections at trial to the admission of that evidence because Appellant's consent to the search of the car was not voluntarily given. Appellant argues that his consent to the search was mere acquiescence to a show of authority.[7]

■ In reviewing a trial court's denial of a motion to suppress, the appellate court's inquiry is limited to determining whether sufficient evidence exists to sustain the trial court's ruling. *State v. Lord,* 43 S.W.3d 888, 890 (Mo.App. S.D.2001). In determining the sufficiency of the evidence, this court may consider the record made at the pre-trial hearing and the record made at trial. *State v. Middleton,* 43 S.W.3d 881, 884 (Mo.App. S.D.2001). We

---

**7.** Appellant also filed a motion to suppress statements he made to Mitchell at the house prior to being Mirandized. *See Miranda v.*

*Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The motion was granted by the trial court.

review the trial court's decision under an abuse of discretion standard and will reverse the trial court's ruling only if it is clearly erroneous. *Id.* If, after reviewing the entire record, the trial court's ruling is plausible, this court may not reverse the trial court's ruling on a motion to suppress even though it would have weighed the evidence differently had it been sitting as the trier of fact. *State v. Page,* 895 S.W.2d 269, 271 (Mo.App. S.D.1995). Although this court will review the court's decision under a clearly erroneous standard, the issue of whether the Fourth Amendment has been violated is a question of law which we review *de novo. Middleton,* 43 S.W.3d at 884.

▮▮▮ Appellant does not challenge the constitutionality of the initial stop, rather, Appellant contends that his consent to the search of the car was not freely and voluntarily given. Article I, § 15 of the Missouri Constitution and the Fourth Amendment of the United States Constitution provides individuals protection from unreasonable searches and seizures. *State v. Rushing,* 935 S.W.2d 30, 34 (Mo. banc 1996). This constitutional protection mandates that any search without a warrant is per se unlawful unless it falls within certain narrowly delineated exceptions. *State v. Shaw,* 915 S.W.2d 775, 779 (Mo.App. W.D.1996). A search or seizure without a warrant is valid if made with proper voluntary consent. *State v. Moore,* 972 S.W.2d 658, 660 (Mo.App. S.D.1998). For consent to be valid, the consent must have been freely and voluntarily given. *State v. Hyland,* 840 S.W.2d 219, 221 (Mo. banc 1992). Whether the consent is valid is determined by looking at the totality of the circumstances. *State v. Smith,* 926 S.W.2d 689, 693 (Mo.App. S.D.1996).

▮▮▮ Consent is freely and voluntarily given if an objective observer would conclude that the person giving consent made a free and unconstrained choice to do so. *Hyland,* 840 S.W.2d at 221. Consent cannot be shown to be freely and voluntarily given, however, merely by showing a submission to a claim of lawful authority. *Middleton,* 43 S.W.3d at 886. The state has the burden of proving by a preponderance of the evidence the consent was voluntary and not the product of duress, coercion, or fraud. *Id.* at 885. In determining whether consent is in fact voluntary, the court examines many factors including, but not limited to, (1) the number of officers present; (2) the degree to which the officers emphasized their authority; (3) whether weapons were displayed; (4) whether the individual was already in custody; (5) whether there was any fraud on the part of the officers; and (6) evidence of what the individual consenting did and said. *Shaw,* 915 S.W.2d at 780.

Although initially Appellant was approached by three officers wearing police uniforms who immediately searched Appellant for weapons and then handcuffed Appellant, by the time of the second consent, only two officers were outside the house and Appellant had been released from his handcuffs. The officers' weapons were holstered at all times.

The officers informed Appellant that they suspected there was a methamphetamine lab in the area. The officers' search of the area outside the house was conducted within Appellant's view. Appellant, who was not handcuffed, waited at the car approximately ten to fifteen yards away from Mitchell while the outside of the house was searched. After Mitchell found that the odor of ether was emanating from the trash can and found items indicating the manufacturing of methamphetamine in the trash can, Mitchell again asked Appellant if he could search the car. Appellant told Mitchell he could search the car and

even gave Mitchell the keys to the locked car. The record is devoid of any evidence of duress, coercion, or fraud on the part of the officers.

A reasonable person would conclude from Appellant's verbal and non-verbal actions that he consented to the search of the car. In light of the totality of the circumstances, it was reasonable for the trial court to conclude that Appellant made a free and unconstrained choice to permit Mitchell to search the car. We cannot say the trial court abused its discretion in admitting the evidence of the two thermos jugs from the car as evidence from a consensual search. Point denied.

■■■ In his second point relied on, Appellant claims the trial court abused its discretion in overruling Appellant's objections and permitting the State to admit evidence at trial of Appellant's physical appearance on September 22, 1999. Appellant argues that evidence of his physical appearance · on that date was irrelevant and analogous to evidence of other crimes. Appellant additionally alleges that the probative value of that evidence was outweighed by it prejudicial effect in that it invited the jury to infer that Appellant was a methamphetamine addict and thus more likely to manufacture methamphetamine.

At trial, over Appellant's objection as to relevance, the prosecutor asked Mitchell to testify regarding Appellant's appearance on the day of Appellant's arrest:

Q. Officer, can you describe for us the differences or how he—the Defendant appeared back in September of 1999 versus how he appears today?

A. In September of '99 he was much thinner, somewhat paler. He also had—looked like some sores on his face.

Q. Based upon your training and 12 years as a law enforcement officer, what if anything did that indicate to you?

A. That he possibly was addicted to methamphetamine.

The State then offered into evidence a photograph taken of Appellant when he was booked on September 22, 1999. The photograph was admitted into evidence over defense counsel's objection as to relevance.

The prosecutor also asked McPhail about his observations as to Appellant's appearance on the day of his arrest over defense counsel's objection:

Q. What observations did you make?

A. Mr. Harp was thin, his skin was pale, he had some sores on his face, and he was visibly shaking when I went to talk to him.

Q. Let's talk about each of those things and what they mean to you. Based upon being an officer, what did those observations indicate to you?

A. Methamphetamine use causes a person to lose their appetite, so they— many times they have drastic weight loss. The nature of the meth and not getting sleep, going long periods of time without eating causes people to become generally unhealthy which many times their skin will be pale.

The chemicals associated with methamphetamine use cannot be processed by the body, and the only way the body has of getting rid of some of those chemicals is to release them through open sores.

. . . .

Q. How was the Defendant acting when you had contact with him?

A. Mr. Harp was—he was shaking, visibly shaking, and he kept staring at the ground when I talked to him. He didn't—he wouldn't look at me

when I asked him questions or when I talked to him. He would look off to the side or downward and that's pretty much what he—the reaction I was getting.

At the pre-trial hearing, the prosecutor noted that Appellant's appearance had changed substantially since the date of his arrest. The photograph to be admitted was taken when Appellant was booked; however, the prosecutor stated that all indications that the photograph was taken during booking were removed. The trial court found that evidence of Appellant's appearance was relevant and its probative value was not outweighed by its prejudicial effect because Appellant was charged with possession of methamphetamine and the evidence of Appellant's appearance helped to explain the officers' investigative actions.

■■■ The trial court is vested with broad discretion to admit and exclude evidence at trial and error will be found only if this discretion was clearly abused. *State v. Clayton*, 995 S.W.2d 468, 474 (Mo. banc 1999). A trial court will be found to have abused its discretion only when the ruling is clearly against the logic and circumstances before the court and is so arbitrary and unreasonable as to shock the sense of justice. *State v. Brown*, 939 S.W.2d 882, 883 (Mo. banc 1997). On direct appeal, the appellate court reviews the trial court's decision for not merely error, but for prejudice, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial. *Clayton*, 995 S.W.2d at 474.

■■■ Generally, evidence of uncharged crimes is inadmissible unless it has a legitimate tendency to establish the defendant's guilt of the crime charged. *Rush*, 949 S.W.2d at 254. "To violate the rule prohibiting evidence of other crimes or misconduct by the accused, the evidence must show the accused committed, was accused of, was convicted of, or was definitely associated with, the other crimes or misconduct." *State v. Ponder*, 950 S.W.2d 900, 911–12 (Mo.App. S.D.1997). Vague remarks are not to be characterized as clear evidence associating the accused with other crimes. *Id.* at 912.

Evidence of Appellant's physical appearance on the day of his arrest and the officers' opinions that Appellant appeared to be addicted to methamphetamine were vague remarks that did not constitute clear evidence associating Appellant with other crimes. The trial court did not abuse its discretion in allowing the officers to testify as to Appellant's appearance on the date of his arrest for the offenses for which Appellant was being tried.

■■■ Even if the evidence of Appellant's physical appearance on the day of his arrest was irrelevant, this court would reverse the trial court's ruling only if the evidence was also so prejudicial as to deprive Appellant of a fair trial. *Clayton*, 995 S.W.2d at 474. "If evidence is improperly admitted, but other evidence establishes essentially the same facts, there is no prejudice to the accused and no reversible error." *Ponder*, 950 S.W.2d at 910. At trial there was other evidence indicating Appellant was addicted to methamphetamine. Stufflebean testified that Appellant had used a syringe to inject methamphetamine and that Stufflebean, Appellant, Angelique McMillan, and Melissa Murphy often shared needles to inject methamphetamine. Defense counsel did not object to this testimony. In addition, the items found by the officers at the house and in the Tempo indicated that Appellant was a user of methamphetamine. Thus, even if evidence of Appellant's physical appearance on the date of his arrest was improperly admitted, it was

not prejudicial. *See Ponder,* 950 S.W.2d at 910. Appellant's second point is denied.

■ In his last point relied on, Appellant asserts that the sentences imposed by the trial court violated his right to be free from double jeopardy as guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and § 556.041.[8] Appellant argues that the offenses of possession of a chemical with intent to create a controlled substance, possession of methamphetamine, and possession of drug paraphernalia with intent to use it to manufacture methamphetamine are part of the continuing course of conduct required to commit the offense of manufacturing a controlled substance because it is impossible to manufacture methamphetamine without possessing anhydrous ammonia, drug paraphernalia, and methamphetamine. Appellant concedes that the issue of double jeopardy was not raised at trial or in his motion for a new trial and thus may only be reviewed for plain error.

It is well-settled law that double jeopardy is a personal right which is waived if not properly raised. *State v. Baker,* 850 S.W.2d 944, 947 (Mo.App. E.D.1993). Appellant failed to raise the issue of double jeopardy to the trial court; therefore, he waived his right to bring that claim. As such, this court is entitled to refuse to review this issue for plain error or otherwise. *See State v. Markham,* 63 S.W.3d 701, 708 (Mo.App. S.D.2002); *State v. Gaver,* 944 S.W.2d 273, 279 (Mo.App. S.D. 1997). We decline to review Appellant's third point relied on for plain error.[9] Point denied.

The judgment is affirmed.

PREWITT, P.J., and SHRUM, J., concur.

---

8. Section 556.041 provides:

When the same conduct of a person may establish the commission of more than one offense he may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if

(1) One offense is included in the other, as defined in section 556.046; or

(2) Inconsistent findings of fact are required to establish the commission of the offenses; or

(3) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or

(4) The offense is defined as a continuing course of conduct and the person's course of conduct was uninterrupted, unless the law provides that specific periods of such conduct constitute separate offenses.

9. Appellant admits that the Western District of this court has held that there is no double jeopardy in convictions for both manufacture of methamphetamine and possession of pseudoephedrine or in convictions for both attempted manufacture of methamphetamine and possession of pseudoephedrine with intent to manufacture methamphetamine. See *Salmons v. State,* 16 S.W.3d 635, 638 (Mo. App. W.D.2000); *State v. White,* 14 S.W.3d 121, 127 (Mo.App. W.D.2000). Appellant invites us to perform our own analysis of the issue. We decline to do so in this case.