STATE of Missouri, Plaintiff–
Respondent,

v.

Steven FRAPPIER, Defendant–Appellant.

No. 20868.

Missouri Court of Appeals,
Southern District,
Division One.

April 4, 1997.

David L. Simpson, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Christine M. Blegen, Assistant Attorney General, Jefferson City, for respondent.

PREWITT, Judge.

Defendant Steven Frappier appeals from his conviction of involuntary manslaughter of his three-month-old son, Matthew.

On November 3, 1993, Defendant was seen in his home with Matthew at 7:45 a.m. by a neighbor. The neighbor testified at trial that Matthew appeared to be normal. At 9:39 a.m., paramedics were dispatched to Defendant's home where they saw Defendant kneeling over Matthew upon their arrival minutes later. According to the testimony of one of the paramedics, Matthew was not breathing, did not have a heartbeat, and appeared cyanotic, a condition indicating that breathing has stopped for a period of time.

After attempting unsuccessfully to revive Matthew, the paramedics transported him to the hospital where a doctor was finally able to get his heart beating again. Later, however, doctors determined that Matthew was brain dead. He was declared dead and taken off life-support systems on November 5, 1993.

An autopsy later revealed Matthew's brain was swollen inside his skull, a condition commonly caused by lack of oxygen, and that he had "metabolic acidosis" which results from a lack of breathing. The autopsy also revealed Matthew had suffered fractures to two bones in his left forearm in the days before his death, as well as an injury to his spleen around the time of his death. Shortly after Matthew's death, an eight-year-old child of Defendant's girlfriend living at Defendant's home told a Missouri Division of Family Services worker that Defendant "hits" and had been physically abusive toward Matthew.

A witness who had shared a jail cell with Defendant in December, 1993, testified Defendant had told him that at the time of Matthew's death he had become frustrated with Matthew's crying and had picked him up by his neck, shook him and threw him down. According to the witness, Defendant came back later to find Matthew pale and cold. The doctor who performed the autopsy eventually concluded Matthew had died from asphyxiation (lack of oxygen), but another doctor who examined the autopsy reports testified the cause of death could not be determined.

■ Defendant was charged with involuntary manslaughter, and a jury found him guilty of that charge on January 5, 1996. He received a sentence of seven years. Defendant's first point relates to the sufficiency of the evidence for the conviction:

> The trial court erred in denying [Defendant's] motion for a judgment of acquittal ... and in submitting the case to the jury ... in that there was no evidence that [Defendant] acted recklessly; the state's evidence was that [Defendant] asphyxiated Matthew by squeezing his neck with both hands for three to four minutes, this evidence could only support a finding that [Defendant] acted intentionally, not recklessly, in causing Matthew's death.

■ When reviewing the sufficiency of the evidence, this Court accepts as true all evidence and inferences favorable to the state and disregards all evidence and infer-

ences to the contrary. *State v. Pierce,* 932 S.W.2d 425, 427 (Mo.App.1996). We do not weigh the evidence or determine the reliability or credibility of witnesses. *Id.* We review the evidence to determine whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

Section 565.024, RSMo 1994 provides, in relevant part:

1. A person commits the crime of involuntary manslaughter if he:

(1) Recklessly causes the death of another person; ...

■ A person "acts recklessly" or "is reckless" when the person acts in such a manner that there is a substantial and unjustifiable risk that the person will cause the death of another, and such person's conscious disregard of that risk constitutes a gross deviation from what a reasonable person would do under the circumstances. *Pierce,* 932 S.W.2d at 427.

Defendant argues that the only evidence submitted on the issue of his mental state shows that victim's death resulted from intentional, not reckless acts. Specifically, Defendant refers to the testimony of the doctor who performed the autopsy that Matthew would have had to have been choked for three to four minutes to die by asphyxiation. Defendant argues picking up a baby and choking it for three or four minutes are intentional acts. However, the doctor also testified asphyxiation could have occurred in several different ways, including holding a hand over Matthew's nose and mouth, preventing air from going into the airway.

The witness who claimed that Defendant had told him about what happened at the time of Matthew's death testified as follows:

Q. Did Defendant make any statement to you as to whether he could get Matthew to be quiet that morning?

A. Yes, he said that Matthew was crying and wouldn't be quiet.

. . . .

Q. Did he make any statements to you as to what he did based upon Matthew not being quiet?

A. Yes. He said he went into Matthew's room and picked Matthew up by the neck.

Q. Did he say what he did with Matthew when he picked him up by the neck?

A. He said he shook Matthew, shook him by the neck with his hands, and threw him back down on the bed.

Q. Did the defendant ever state whether he was able to recall everything that he did?

A. No. He did say that he wasn't able to recall everything he did because he blacked out.

Q. Did the defendant tell you whether he noticed anything wrong with the baby after he threw Matthew on the bed?

A. Yes. He said he noticed the baby was pale and was cold when he touched the baby.

Based on the above evidence, it is possible to infer that Defendant did not intentionally choke Matthew, but tried to quiet him by holding his neck and thereby asphyxiated him. A reasonable juror could determine that there was a substantial and unjustifiable risk that quieting Matthew in this manner would cause Matthew's death and that Defendant's conscious disregard of that risk was a gross deviation from what a reasonable person would do under the circumstances. *See Pierce,* 932 S.W.2d at 427–28 (Mo.App. 1996) (affirming involuntary manslaughter conviction of defendant who, after altercation with victim, backed a truck into him and then ran over him).

Quoting from *State v. Isom,* 906 S.W.2d 870, 873 (Mo.App.1995), Defendant argues "evidence that a defendant intended the act which caused the death, even if he did not intend the result, supports submission of voluntary, not involuntary, manslaughter." In *Isom,* the defendant claimed he intended to shoot victim, but not in such a way as to kill him. However, the *Isom* court noted that intending to shoot the victim in the upper portion of the body went beyond recklessness. 906 S.W.2d at 873. In *State v. Morris,* 784 S.W.2d 815 (Mo.App.1990), which the *Isom* court cites, the defendant admitted to striking his wife with a two-by-four board

after she revealed she had had an affair. *Id.* at 816.

Unlike in those cases, here there was evidence Defendant may not have intended the act, i.e., asphyxiating Matthew, which caused death. The jury would know that intentionally killing one's child is not a natural or usual act. It could have found that Defendant was trying to quiet rather than kill the child, but in doing so acted recklessly, causing the child's death. There was sufficient evidence to sustain a conviction for involuntary manslaughter; therefore, the trial court did not err in denying Defendant's motion for judgment of acquittal. Point denied.

■ Defendant's second point claims the State failed to prove the *corpus delicti* in that Matthew was "just as likely" to have died from not breathing during the time he was taken to the hospital as he was during the time Defendant was holding Matthew's neck.

■ The *corpus delicti* in a homicide case consists of (1) a person's death, and (2) the criminal agency of another. *State v. Weston,* 912 S.W.2d 96, 100 (Mo.App.1995). The *corpus delicti* cannot be presumed and must be proved by legal evidence sufficient to show that the specific crime charged has actually been committed by someone. *State v. McFall,* 866 S.W.2d 915, 917 (Mo.App. 1993).

As discussed under the first point, there was testimony that Defendant had treated Matthew roughly in the past and picked him up by his neck shortly before his death. This testimony was corroborated by the autopsy, which indicated to a physician that Matthew may have been abused and his death caused by asphyxiation. There was also testimony that Matthew was fine two hours before paramedics arrived, and when they arrived he had no heartbeat or respiration. This evidence was sufficient to prove that criminal agency was the cause of Matthew's death. *See State v. Fears,* 803 S.W.2d 605, 608 (Mo. banc 1991). Point denied.

■ Defendant offers the following for his final point:

The trial court erred in denying [Defendant]'s motion for acquittal ... because the evidence was insufficient to show that [Defendant] caused the death of Matthew in that death is defined in section 194.005 as "an irreversible cessation of spontaneous respiration and circulation," and the injury allegedly caused by [Defendant] did not irreversibly stop Matthew's spontaneous circulation.

Section 194.005, RSMo 1994, provides in relevant part:

For all legal purposes, the occurrence of human death shall be determined in accordance with the usual and customary standards of medical practice, provided that death shall not be determined to have occurred unless the following minimal conditions have been met:

(1) When respiration and circulation are not artificially maintained, there is an irreversible cessation of spontaneous respiration and circulation; or

(2) When respiration and circulation are artificially maintained, and there is a total and irreversible cessation of all brain function, including the brain stem and that such determination is made by a licensed physician.

Defendant claims there was no testimony establishing that Matthew's circulation was artificially maintained and therefore Matthew's death could not have occurred until there was an irreversible cessation of respiration and circulation as required by § 194.005(1). Defendant thus concludes that the proximate cause of Matthew's death was the removal of life support systems rather than his own actions.

Testimony by the physician in charge of Matthew's care at the time of death refutes Defendant's claim. The transcript shows that the doctor testified:

Q. What course of action did you take with Matthew over the next two to three days?

A. This young man's condition was such that without life support measures he would not have been able to sustain his body processes. During the course of the next two days he re-

ceived a variety of measures in the form of assistance for his heart, extra fluids, breathing assistance, and there was diagnostic studies performed.

Q. Were any of these measures taken ... with a goal to improve Matthew's condition in any way, or was it just to keep him alive?

A. Well, the situation in treating the patient at Cox North was that of a child who had suffered and [an?] arrest of his heart and respiration outside the hospital. The prognosis of that with small children is very, very poor. The initial attempt at resuscitation was continued there in the effort to see if there was any return of function that could be achieved by normalizing or maximizing the blood pressure and respiration and the other parameters.

Unfortunately in this particular child there was no recovery of neurologic function and ultimately he was declared brain dead.

Q. Now explain to the jury and me what you mean by neurologic function.

A. There are ... reflexes in a person who is not fully conscious which are operative. For example, when a patient is asleep they breathe on their own, their heart beats, they move their extremities in response to things. None of these things occurred. In fact we could find no evidence of any function or reflexes that were present in this youngster after his arrival.

Q. Did he have any type of sensation at all ... ?

A. There was never a return of function of any kind.

Q. Did you consider Matthew Frappier to be brain dead?

A. Yes.

. . . .

Q. Was the life support the only thing that was keeping Matthew alive during this period?

A. Yes.

. . . .

Q. On November 5th of 1993 was there any determination made regarding what to do in terms of Matthew's life support?

A. Once brain death has been declared, that is death and there is no longer any indication to continue measures to support the heart.

Q. And what action was taken then?

A. Those systems are removed.

From the above testimony a jury could conclude that not only Matthew's respiration but also his circulation was being artificially maintained and that he was legally dead upon the doctor's determination that he was brain dead in accordance with § 194.005(2). Thus, removal of life support systems could not have been the proximate cause of Matthew's death. Point denied.

The judgment is affirmed.

BARNEY, P.J., and GARRISON, J., concur.