**STATE of Missouri, Plaintiff/Respondent,**

v.

**Stacy MARTINDALE,
Defendant/Appellant.**

No. 69758.

Missouri Court of Appeals,
Eastern District,
Division One.

May 27, 1997.

Raymund J. Capelovitch, Asst. Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Becky Owenson Kilpatrick, Assistant Attorney General, for respondent.

REINHARD, Judge.

Defendant appeals after her conviction by a jury of one count of second degree murder, § 565.021, RSMo 1986.[1] The court sentenced her in accordance with the jury's assessment to a prison term of fifteen years. We affirm.

The record reveals that Randy Martindale and defendant married in 1988 and subsequently had two sons. Martindale and defendant both worked at the Martindale family car dealership in New Madrid, Missouri.

Defendant and Chuck Sanders began having an affair in 1990. According to Sanders, the relationship repeatedly ended and resumed between 1990 and 1994, and defendant told him that he was the biological father of her youngest son. Sanders recalled that defendant also informed him that Martindale had physically beaten her during an argument on the side of Highway 55 in February 1994. A state patrolman confirmed that Martindale had been arrested but not charged in the incident.

In early May 1994, Martindale and defendant separated, and Martindale moved to his parents' house, which was approximately one block away from the marital home. Sanders testified that beginning in 1994, defendant repeatedly asked him to kill her husband. At one point, defendant gave Sanders a check in the amount of $4,996.36 as payment for a small computer and partial payment for the planned murder, and she promised to "pay the balance of $10,000.00" after Martindale had been killed. Sanders ultimately refused to kill Martindale and returned the check to defendant.[2]

On the evening of May 19, 1994, Martindale took the two boys to a baseball game, and defendant arranged to meet two friends at a restaurant in Sikeston. Before meeting her friends, defendant stopped at the Sikeston mall and visited with Sanders in the mall parking lot.[3] During their conversation, defendant again asked Sanders to kill Martindale. When he refused, defendant told him she was going to ask Sanders' friend, Richard Clay. Sanders and defendant then went into Radio Shack, where Sanders worked, and chatted with Clay and Mike Frederick, Sanders' coworker. Frederick and Clay had been planning to eat at a nearby Hardee's after Frederick closed the store, and defendant and Sanders agreed to join them. Clay did not own a car and rode to Hardee's with defendant. Frederick and

---

1. All statutory citations are RSMo 1986.

2. Robert Lay, Sanders' former roommate, testified that he found a carbon copy of the check in a magazine on his coffee table. Mark Kolwyck, Martindale's brother-in-law and an employee of the Martindale car dealership, testified that the check carbon found by Lay matched one of six checks missing from the dealership.

3. Defendant told police that she saw Sanders in the parking lot by chance. Sanders testified that defendant had arranged the meeting.

Sanders left Radio Shack after defendant and Clay but arrived at Hardee's first.

Later in the evening, defendant met her friends as planned and left the restaurant around 9:45 p.m. Meanwhile, Frederick drove Clay to several locations and eventually left him at the Ramada Inn in Sikeston at approximately 9:15 p.m. The hotel was on the route between New Madrid and the Sikeston restaurant where defendant had eaten with her friends. Clay told Frederick that he would meet him later in the evening, but Frederick did not see Clay the rest of the night.

In her statements to the police, defendant asserted that she arrived home at approximately 10:30 p.m., and Martindale and the boys returned home ten or fifteen minutes later. Defendant asked Martindale to spend the night, and Martindale went to the master bedroom while defendant tucked the boys into bed. Defendant then went into the master bedroom, but she later left the room to get a glass of water from the kitchen. After returning to the bedroom, defendant retrieved a blanket from the hall closet for Martindale before she lay down on the bed. Martindale subsequently decided to spend the night at his parents' home and got up to dress. While Martindale was dressing near the bed, defendant leaned over to take a drink of water and heard three or four bangs. She immediately ran to the boys' bedroom. After seeing her red Camaro being driven away, defendant ran to her neighbor's house, screaming for help. Police subsequently discovered that Martindale had been shot and killed while sitting on a couch in the bedroom. Defendant asserted that she never saw the shooter and stated to the police, "This makes me so mad." The murder occurred at approximately 11:30 p.m.

Following the murder, police found a leather work glove on a vanity in the master bedroom and discovered the matching glove underneath some blankets in the hall closet.[4]

Police found no evidence of forced entry into the house.

At approximately 11:30 p.m., prior to the emergency dispatch relating to the Martindale shooting, a New Madrid police officer noticed a red Camaro emitting sparks from a toy tractor dragging underneath the vehicle. Suspecting a drunk driver, the officer activated the lights and siren of his police car and attempted to pull the Camaro over. After a brief pursuit, the officer found the car stopped in the middle of the road with the doors open and the engine running. He saw no one in the vicinity of the vehicle. Other police officers determined that the Camaro belonged to defendant.

At approximately 12:30 p.m. the following day, a police officer found Richard Clay hiding in a swamp near the area of the abandoned car. Clay's shoes were similar to a footprint found near the car. Between the car and the swamp, police officers recovered a swatch of cloth matching Clay's shirt and a bullet from the same magazine as the bullets used to kill Martindale.

Sanders testified that after the murder, he disposed of a box of ammunition similar to the type used to kill the victim. Sanders also asserted that his .380 Bersa handgun was missing. The gun was similar to the type of weapon used to kill Martindale, and Sanders testified that Clay often took it without his knowledge.[5] The murder weapon was never recovered.

Bobby Martin, an insurance agent, testified that he rewrote a $100,000 life insurance policy for Martindale in 1993. At that time, he met with defendant and Martindale and explained the general terms of the contract. Defendant was the primary beneficiary on the policy.

Defendant was charged with first degree murder and convicted of second degree murder. On appeal, she contends the trial court

---

4. During closing argument, the prosecutor argued that defendant had hidden Clay in a closet before Martindale returned home and had given the gloves to Clay "to make sure that no traces or any evidence [were] left on his hands."

5. Sanders admitted that in exchange for his trial testimony, he had been offered a plea agreement of ten years for his participation in Martindale's murder.

"plainly erred"[6] in submitting the second degree murder instruction because the evidence was insufficient to support the instruction.

Defendant relies primarily upon *State v. Anding*, 752 S.W.2d 59 (Mo. banc 1988). In *Anding*, the defendant was charged with capital murder and convicted of manslaughter. The trial court had automatically submitted the manslaughter instruction to the jury as a lesser included offense of murder. *Id.* at 60. The Missouri Supreme Court reversed the defendant's conviction and held that the automatic submission of the manslaughter instruction was erroneous because it was not supported by the evidence:

The record in this case clearly indicates that defendant was either guilty of deliberate, premeditated murder or of nothing at all. If the State's evidence is believed defendant contracted to have [the victim] murdered more than a year before the murder took place. During that year defendant allegedly planned the murder with the help of [his accomplice]. The time of the murder was purposefully set to coincide with a time when defendant was out of the state. The brutal slaying of [the victim] was carried out while the victim was being held down in his chair. There are simply no facts in this case upon which to conclude that the killing of [the victim] was provoked or was committed without deliberation, malice, and premeditation. Consequently, the trial court erred in instructing the jury on manslaughter because there was no evidence to support such an instruction. [The instructions and case law] requiring automatic submission of manslaughter should not be followed.

*Id.* at 62.

The state's appellate brief does not attempt to distinguish *Anding*. Significantly, the state does not argue that the evidence presented at trial justified the submission of the second degree murder instruction. Instead, the state contends that the ruling in *Anding* was erroneous and should be reex-

amined. Before addressing the state's argument, we initially must determine whether *Anding* continues to be valid precedent.

In *State v. Leisure*, 796 S.W.2d 875 (Mo. banc 1990), decided two years after *Anding*, the defendant was charged with capital murder but convicted of manslaughter. During the trial, both the state and the defendant tendered manslaughter instructions. *Leisure*, 796 S.W.2d at 876. On appeal, the Missouri Supreme Court considered *Anding* but affirmed the conviction, holding that "a defendant cannot complain of an instruction given at his request." *Leisure*, 796 S.W.2d at 877.

The *Leisure* court also based its holding on § 545.030.1, which provides, in relevant part:

[No criminal] trial, judgment or other proceedings thereon [shall] be ... in any manner affected:

* * *

(16) For any error committed at the instance or in favor of the defendant; nor

(17) Because the evidence shows or tends to show him to be guilty of a higher degree of the offense than that of which he is convicted....

On its face, § 545.030.1(17) is somewhat inconsistent with the holding of *Anding*.[7] However, the *Leisure* court applied paragraph seventeen in conjunction with paragraph sixteen and concluded:

If the trial court erred in giving the manslaughter instruction, it was error committed at the instance of defendant, and most certainly he considered it in his "favor" [paragraph sixteen]. Hence, it should not "in any manner" affect his conviction. The conviction for manslaughter may be upheld under these circumstances even though the evidence tends to show defendant to be guilty of a higher degree of homicide [paragraph seventeen]....

*Leisure*, 796 S.W.2d at 878. (Citations omitted).

---

6. Defendant's appellate brief asks for review under plain error, apparently recognizing the significance of defense counsel's failure to properly object at trial.

7. Judge Blackmar alluded to this inconsistency in footnote two of his concurring opinion in *Anding*, 752 S.W.2d at 63.

■ Although *Leisure* was not a resounding endorsement of *Anding,* the *Anding* principle clearly remains the law in Missouri. *See State v. Isom,* 906 S.W.2d 870 (Mo.App. S.D.1995). *See also State v. Fox,* 916 S.W.2d 356 (Mo.App. E.D.1996); *State v. Leisure,* 838 S.W.2d 49 (Mo.App. E.D.1992); *State v. Nodine,* 810 S.W.2d 114 (Mo.App.1991); *State v. Franks,* 793 S.W.2d 543 (Mo.App. 1990); *State v. Reynolds,* 782 S.W.2d 793 (Mo.App.1989); and *State v. Miller,* 772 S.W.2d 782 (Mo.App.1989).

The Southern District specifically addressed *Anding* and the application of § 545.030.1(17) in *State v. Isom,* in which the defendant appealed from his conviction of involuntary manslaughter. 906 S.W.2d at 872. The defendant had been charged with second degree murder, and the trial court submitted an involuntary manslaughter instruction over the defendant's objection. *Id.* at 871–72. On appeal, the state argued that § 545.030.1(17) mandated affirmance of the conviction of the lesser offense. *Id.* at 874. Noting that Judge Blackmar had mentioned the statute in his concurring opinion in *Anding,* the Southern District was not persuaded and concluded that the argument had been "obviously rejected by the majority in *Anding.*" *Isom,* 906 S.W.2d at 874. The court then reversed the conviction and discharged the defendant.[8] *Id.* at 875.

The Missouri Supreme Court has considered and reconsidered the issue before us in the *Anding* and *Leisure* cases. We are constrained to follow those decisions and instead address a more persuasive argument by the state.

The state asserts that defendant's second degree murder conviction should be affirmed because defendant waived any error relating to the submission of the second degree murder instruction. The record does not indicate that defense counsel tendered a second degree murder instruction, which would result in waiver under *Leisure* and its progeny.[9] However, the state urges that defense counsel waived the issue by failing to object to the second degree murder instruction at any time during the trial.[10]

Rule 28.03, effective more than three months before defendant's trial,[11] outlines the procedure for preserving objections to instructions:

Counsel shall make specific objections to instructions or verdict forms considered erroneous. **No party may assign as error the giving or failure to give instructions or verdict forms unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.** Counsel need not repeat objections already made on the record prior to delivery of the instructions and verdict forms. The objections must also be raised in the motion for new trial in accordance with Rule 29.11.

(Emphasis added).

■ Because defense counsel did not object to the second degree murder instruction at trial, defendant may not "assign as error the giving" of the instruction. Rule 28.03. A defendant cannot stand idly by, permit the giving of an erroneous instruction, and then benefit from her inaction. *See Lindsey Masonry Company, Inc. v. Jenkins and Associates, Inc.,* 897 S.W.2d 6, 10 (Mo. App. W.D.1995). We believe that if the revised version of Rule 28.03 is to have any effect, the failure to specifically object must constitute a waiver. *See State v. Brisco,* 934 S.W.2d 335, 336–37 (Mo.App. W.D.1996); *State v. Ford,* 906 S.W.2d 761, 766 (Mo.App. W.D.1995); *State v. Scott,* 858 S.W.2d 282, 285–86 (Mo.App. W.D.1993).[12]

---

8. The *Isom* decision explained that the trial court had erred in automatically submitting the involuntary manslaughter instruction because all of the evidence indicated that the shooting was intentional. *Isom,* 906 S.W.2d at 873.

9. *See State v. Giles,* 926 S.W.2d 227 (Mo.App. E.D.1996); *State v. Beckett,* 858 S.W.2d 856 (Mo. App. W.D.1993); *State v. Nodine,* 810 S.W.2d 114 (Mo.App.1991).

10. Defense counsel first raised the issue in his "Motion for Judgment of Acquittal or, in the alternative, Motion for New Trial."

11. Rule 28.03 became effective July 1, 1995. Defendant's trial began October 16, 1995.

12. *See also Pace Properties, Inc. v. American Manufacturers Mutual Insurance Company,* 918

674

In *Leisure,* the Missouri Supreme Court reaffirmed the principle that a defendant cannot be convicted of a lesser included offense when the submission of the lesser instruction is not supported by the evidence. However, the *Leisure* decision held that a challenge to such a conviction could be waived by the defendant at trial. We discern no material difference between waiver by the affirmative action of submitting the lesser instruction, as in *Leisure,* and waiver by failing to specifically object at trial, as required by Rule 28.03. Thus, we must conclude that defendant has waived her claim of error regarding the submission of the second degree murder instruction.

Judgment affirmed.

DOWD, P.J., and GARY M. GAERTNER, J., concur.

S.W.2d 883, 887 (Mo.App. E.D.1996) (based on Rule 70.03, the civil procedure rule for preserving objections to instructions) and *Lindsey Masonry Company,* 897 S.W.2d at 10–11 (also based

on Rule 70.03). The language of the amended version of Rule 70.03, which became effective January 1, 1994, parallels the language of the amended version of Rule 28.03.