**STATE of Missouri, Respondent,**

v.

**Yvonne CARLILE, Appellant.**

No. 22377.

Missouri Court of Appeals, Southern District, Division One.

Jan. 26, 2000.

Ronald D. White, Williams, Robinson, White, Rigler & Parker, P.C., Rolla, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Machelprang, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Presiding Judge.

Appellant, charged with murder in the second degree, was found guilty by a jury of involuntary manslaughter. § 565.024.[1] The jury assessed punishment at four years' imprisonment. The trial court entered judgment per the verdict.

Appellant presents three assignments of error, the first of which reads:

> "The trial court erred in giving Instruction No. 7 (involuntary manslaughter) to the jury because there was no evidence from which the jury could acquit the defendant of murder in the second degree and convict her of involuntary manslaughter in that there was no evidence that the death of Jessica Vacanti was caused by a reckless act."

Adjudicating the above point requires an account of the facts. In assembling them, this court accepts as true all evidence supporting the verdict, including all favorable inferences therefrom, and disregards all contrary evidence and inferences. *State v. Chaney*, 967 S.W.2d 47,

---

1. The version of § 565.024 in force when the crime occurred was the version in RSMo 1994. It read, in pertinent part:

    "1. A person commits the crime of involuntary manslaughter if he:

    (1) Recklessly causes the death of another person; or

    (2). . . .

    2. Involuntary manslaughter is a class C felony."

    Section 565.024, RSMo 1994, was repealed and replaced by a new version, identically numbered, in Laws of Missouri 1999, S.C.S.S.B. 328, 87, 100 and 55, pp. 1388–92.

52[4] (Mo. banc 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998).

On May 18, 1996, Appellant was residing in a house at Doolittle, Missouri,[2] with: (1) her husband, Robert; (2) her fifteen-year-old daughter, Candice; (3) her ten-year-old son, Craig; and (4) Jessica Vacanti.

Jessica,[3] age six,[4] was the daughter of Robert's sister, Elizabeth. Jessica lived with Appellant and Robert pursuant to an order of an Illinois court. Robert explained: "[Elizabeth] thought that [Jessica] would be better off living with us than in the life that she was living with her."

Appellant and Robert were employed in Rolla, she at Powell Lumber and Home Center, he at Steak 'n Shake.

May 18, 1996, was a Saturday. Appellant was scheduled to be at work at 8:00 a.m. that day, so she arose around 6:00 and began "[g]etting ready for work." Candice was scheduled to go on "a field trip to Six Flags," so Appellant awoke Candice before Appellant left the house.

According to Appellant, the drive to work took about fifteen minutes. Appellant arrived at work at 7:46.[5]

Meanwhile, Craig had awakened after Candice arose. Candice awoke Robert, as he had to drive her to school where she was to board a bus for Six Flags.

Robert and Candice left the house about 7:45. Jessica was still asleep.

The trip to school took only a few minutes. After leaving Candice there, Robert returned home, arriving "a little after 8:00."

Like Appellant, Robert was scheduled to work that day; his shift began at 10:00 a.m.

He showered, dressed for work, and left the house "about 9:30." By that time, Jessica was awake. She and Craig "were in the living room watching cartoons."

Robert avowed he did not injure Jessica before departing.

Appellant left work for lunch at 11:09. She drove home. Asked at trial what occurred when she arrived, Appellant answered, "[M]y keys were in the van, so I knocked on the door and [Jessica] answered the door." Appellant's testimony:

"I asked her if she knew who ... was at the door and she said no.... I asked her why she had opened the door and she said, 'Craig is in the shower.' ... I told her that she's not supposed to answer the door. I grabbed her by the hand and I spanked her on the butt twice and I told her ... why I had spanked her and if she understood why I had spanked her and she said yes and she just kept saying that she was sorry—that she knew that she wasn't supposed to answer the door and she should have got Craig."

Asked what she spanked Jessica with, Appellant answered, "With my hand."

Craig heard Jessica crying as he exited the shower.

Appellant fixed lunch for Craig and Jessica. After eating lunch, Jessica vomited. Appellant recounted at trial that she "cleaned up the mess and laid [Jessica]

2. Doolittle is in Phelps County near Rolla. The case was tried in Pulaski County on a change of venue.

3. For brevity and clarity, this opinion henceforth refers to the individuals in Appellant's household by their respective forenames. No disrespect is intended.

4. This court finds no evidence of Jessica's age in the record, and the statement of facts in each side's brief does not mention her age.

However, both the prosecutor and Appellant's lawyer, in their opening statements, told the jury Jessica was six at the time of the events in issue. There is evidence she was a kindergarten student.

5. Powell Lumber and Home Center has an "electronic time clock" that records the time employees arrive and depart. The evidence regarding Appellant's arrivals and departures there was compiled from that source.

down for her nap." Appellant then returned to work, arriving at 12:16.

Craig and Jessica remained home alone that afternoon. Craig recalled Jessica stayed mainly in her room.

Appellant left work at 4:07 and arrived home around 4:30.

Candice was scheduled to return from Six Flags at 8:00. As Appellant was preparing to leave the house to pick up Candice at school, Jessica "said her belly hurt" and vomited. Appellant placed Craig and Jessica "in the van" and drove to school.

Candice recalled that when Appellant, Craig and Jessica picked her up, Jessica "looked sick."

Appellant related that after the quartet arrived home, Jessica "still felt ill." According to Appellant, "She looked white, like you normally look when ... you're sick." Appellant took Jessica's temperature; it was 101. Jessica vomited "probably a couple [of times]" that evening.

Robert's shift at Steak 'n Shake ended at 8:00 p.m. He departed for home shortly thereafter. Upon arrival, he observed Jessica was sick.

Robert had to be at work at 7:00 a.m. the next day (Sunday, May 19). He left the house about 6:45. No one else was awake.

Candice awoke around 10:30 or 11:00. She saw Jessica in the kitchen. It appeared to Candice that Jessica "had the stomach flu."

Craig recalled that although Jessica played outside with him that day, she remained sick, complained of abdominal pains, and looked pale and slow.

Appellant testified Jessica vomited after breakfast that morning (Sunday) and complained during the day that her stomach hurt. Toward evening, Jessica "was slow-

er than ... she normally was [and] still felt ill."

Robert arrived home from work around 5:30 p.m. Jessica was sick and lying in bed. Robert kissed her. She smiled and said she didn't feel well.

Robert went outside to mow the yard. He finished around 8:00. Appellant told him Candice needed some sunburn lotion and Jessica "had been throwing up some more." Appellant asked Robert to go to WalMart and buy Pedialyte for Jessica and lotion for Candice.

Robert drove to WalMart and also stopped at a "video store" to "buy a movie."

Upon returning home, he began watching the movie. Appellant said she would give Jessica the Pedialyte.

Suddenly, Robert heard Appellant screaming his name. Robert ran to Jessica's bedroom. His testimony:

"[Appellant] was sitting by the bed and she had Jessica and she kept shaking her, saying, 'Wake up, Jessie, wake up.' And she said, 'I can't get her to wake up.' And I looked at her and her eyes were all glazed over and I knew she was gone."

Robert laid Jessica on the floor to attempt "CPR," but was unsuccessful because "stuff just kept coming [from Jessica's mouth]."

Appellant, seated on the floor, was crying, "I'm so sorry, Elizabeth—I'm so sorry."

Robert carried Jessica to "the van" and drove to Phelps County Regional Medical Center in Rolla, a journey of approximately five miles. Upon arrival,[6] Robert handed Jessica to a nurse at the emergency room. Describing Jessica's condition, the nurse testified: "When I first looked at her, she looked like she was dead. . . .

---

**6.** According to the transcript, "medical records" show Robert arrived with Jessica at

10:42 p.m.

She was cyanotic—didn't appear that she was breathing."

An emergency room physician attempted to resuscitate Jessica, but the effort was futile. The physician pronounced Jessica dead at 10:51 p.m. He estimated she had been dead "about an hour."

A "board certified" forensic pathologist who had performed "somewhere between eight and nine thousand autopsies" performed an autopsy on Jessica's body Tuesday morning, May 21, 1996. The procedure began at 8:45 and ended around 10:30.

The pathologist determined Jessica died because of a rupture of her duodenum. The pathologist explained:

"The first part of the small bowel is the duodenum and that part was torn. The material that is normally present in the bowel had leaked out and contaminated the abdominal cavity that we refer to as the peritoneal cavity, resulting in an inflammatory process we call peritonitis. So the cause of death was this inflammatory process of peritonitis and very possibly disseminated substance where there is infection throughout the blood stream related to the rupturing of this piece of bowel."

The pathologist characterized the rupture as an "inflicted injury," i.e., one that did not occur by accident. According to the pathologist: "This kind of injury would require quite a significant force. The child at the time of the injury, other people would have been aware of this and would have taken this child immediately for treatment."

Describing how such an injury could be inflicted, the pathologist said:

"[T]he type of mechanism that would be consistent with this injury is some massive force applied to the abdomen—a punch or a kick to the front part of the abdomen—something that has a small striking surface that strikes very forcefully so that the organs are pushed abruptly to the back of the spine[.]"

According to the pathologist, an adult could strike such a blow, but an average ten-year-old child would not be strong enough.

Asked how soon after such an injury a child would begin exhibiting symptoms, the pathologist replied:

"At the time of the injury, it would be painful—there would be pain in the abdomen. And then there might be a period after the pain goes away that the child does not appear too abnormal. But within the next few hours, the child would begin to have [gastrointestinal] symptomatology such as nausea and vomiting. The child would not be running around, playing and doing the usual things. The child would not be eating in the normal way. The child could ingest material but would not be eating, would not be hungry, would not want to eat.... There would be vomiting. There could be a very cramping type of pain in the abdomen. Eventually the child would become very, very lethargic and kind of stuporous as they became desperately ill."

In the pathologist's opinion, the trauma that ruptured Jessica's duodenum occurred "somewhere between thirty-six and forty-eight" hours before she died.

Sergeant Ralph Roark of the Missouri State Highway Patrol was informed of the "preliminary autopsy results."

About 3:00 p.m. that same day (May 21, 1996), Roark talked with Appellant at Troop I headquarters in Rolla. Asked how the interview came about, Roark explained: "I believe she arrived with her husband, Robert Carlile. They drove in at our request." Deputy Sheriff Rick Williams of Phelps County was present during the interview.

According to Roark, Appellant recounted her activities of Saturday, May 18, from the time she left the house for work until she put Jessica to bed that evening. Appellant told Roark that Jessica was sick

that night with "flu-like symptoms" and a fever of 101 degrees. Appellant then described Jessica's condition on Sunday, May 19, including Jessica's complaints of abdominal pain, her vomiting, and her fever.

After that chronology, Appellant told Roark she entered Jessica's bedroom about 10:00 p.m. Sunday and discovered Jessica was not breathing. Appellant's account to Roark of the events thereafter was consistent with the narrative earlier in this opinion.

Roark then told Appellant about the autopsy results. After that, he informed her of her "Miranda rights."[7] Appellant said she understood them and was willing to answer questions without a lawyer.

Appellant revealed she had spanked Jessica with a "wooden bread board" about six weeks earlier. Appellant denied spanking Jessica since that incident.

Roark told Appellant the pathologist believed Jessica had suffered a "ruptured bowel" due to blunt trauma in the abdominal area.

Appellant then revealed she had spanked Jessica on Saturday, May 18. The spanking was administered because Jessica opened the door alone when Appellant arrived home. Roark's testimony:

"Q Did [Appellant] characterize her reaction when Jessica opened the door?

A From the notes in my report, she stated that she was extremely upset with Jessica for opening the door.... I asked her how she spanked her—she stated with her hand. I asked her if she struck her in the abdomen—she said that was possible—reemphasized that she was very upset, but she stated that she didn't remember hitting her in the abdomen.

. . . .

Q What were the words that [Appellant] used.

A The first time she stated—when Jessica opened the door, that she was extremely angry with Jessica for opening the door. There was a brief conversation—I asked her again—'Did you—is there a possibility that you struck Jessica in the abdomen when you spanked her?' She replied—'It's possible, but I don't remember it. I was very angry with Jessica.'

Q Did she tell you what happened after that?

A After the spanking, she stated again that she noticed that Jessica hadn't brushed her teeth—took her into bathroom—had her rinse her mouth out with Plax. Again she stated that she swallowed some Plax—became ill shortly after that—or while eating a sandwich shortly after this incident with making her brush her teeth."

Appellant, testifying at trial, avowed she did not punch Jessica in the abdomen on Saturday, May 18, or Sunday, May 19. Appellant denied striking Jessica in the abdomen with any object, and also denied kicking Jessica in the stomach.

During the instructions conference at the conclusion of the evidence, the trial court announced it would give Instruction 7 which read, in pertinent part:

"If you do not find the defendant guilty of murder in the second degree, you must consider whether she is guilty of involuntary manslaughter.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about May 18, 1996, in the County of Phelps, State of Missouri, the defendant caused the death of Jessica Vacanti by striking her in the abdomen, and

Second, that defendant recklessly caused the death of Jessica Vacanti,

7. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

then you will find the defendant guilty of involuntary manslaughter.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of involuntary manslaughter.

In determining whether the defendant recklessly caused the death of Jessica Vacanti, you are instructed that a person acts recklessly as to causing the death of another person when there is a substantial and unjustifiable risk he will cause death and he consciously disregards that risk, and such disregard is a gross deviation from what a reasonable person would do in the circumstances.

. . . ."

Appellant's lawyer objected to Instruction 7 because the blow that killed Jessica "could only be struck intentionally" and there was no evidence to support a finding that such a blow "was struck in a reckless fashion." Appellant's lawyer argued that involuntary manslaughter should not be submitted "where the homicide as charged could only be conducted in an intentional fashion."

Continuing that theme in this appeal, Appellant asserts: "[T]he evidence established that someone committed murder in the second degree upon Jessica Vacanti, but ... there was no evidence from which a jury could find that [Appellant], or anyone else, acted recklessly in causing the fatal injury."

One of the cases on which Appellant relies is *State v. Anding*, 752 S.W.2d 59 (Mo. banc 1988). There, the State's evidence showed the accused hired one Chandler to kill the victim. *Id.* Chandler, accompanied by his brothers, went to the victim's office and stabbed him to death. *Id.* at 60. The accused was charged with capital murder. *Id.* The trial court submitted capital murder, second degree murder, and manslaughter to the jury. *Id.* The jury acquitted the accused of capital murder and second degree murder, but found him guilty of manslaughter. *Id.*

The Supreme Court of Missouri held the trial court erred in submitting manslaughter, as there was no evidence to support the submission. *Id.* at 62. The opinion explained:

"The record in this case clearly indicates that defendant was either guilty of deliberate, premeditated murder or of nothing at all. If the State's evidence is believed defendant contracted to have [the victim] murdered more than a year before the murder took place. During that year defendant allegedly planned the murder with the help of ... Chandler. The time of the murder was purposefully set to coincide with a time when defendant was out of the state. . . . There are simply no facts in this case upon which to conclude that the killing ... was provoked or was committed without deliberation, malice, and premeditation."

*Id.* at [2].

■ *Anding* obviously differs from the instant case in that there is no evidence that anyone planned to kill Jessica or that anyone enlisted someone else to kill her. *Anding* is relevant to this appeal only insofar as it holds that in a murder case, a trial court must not instruct on manslaughter unless there is evidence to support each element required for a manslaughter conviction.

Appellant also cites *State v. Isom*, 906 S.W.2d 870 (Mo.App. S.D.1995). There, the accused shot the victim to death. *Id.* at 871. The accused testified he shot in self-defense, as he feared the victim was reaching into his pocket for a gun. *Id.* at 872. According to the accused, he intended to shoot the victim in the arm. *Id.* However, the bullet entered the victim's chest and pierced his heart. *Id.*

The trial court in *Isom* instructed the jury on second degree murder and involuntary manslaughter. *Id.* The jury found the accused guilty of the latter offense.

*Id.* at 871.  On appeal, the accused maintained that under the evidence he was either guilty of second degree murder or entitled to an acquittal on self-defense. *Id.* at 872.

■  This court said:

"Defendant's actions in the instant case went beyond recklessness and constituted conduct which was likely to produce death.  As indicated earlier, Defendant's theory that he shot in self-defense indicates a voluntary, intentional act.  There was no evidence of recklessness or an unintentional or accidental shooting.  Conduct which is not involuntary *and transcends mere recklessness* will not support an instruction on involuntary manslaughter."

*Id.* at 873–74[9] (emphasis added).

It is noteworthy that the State in *Isom* did not argue that the evidence supported a finding of recklessness (and consequently a submission of involuntary manslaughter). *Id.* at 874.  Instead, the State insisted that inasmuch as the evidence tended to show the accused was guilty of second degree murder, he could not complain that he was convicted of a lesser offense.  *Id.*

This court, relying on *Anding*, 752 S.W.2d 59, rejected the State's argument and held that because the evidence was insufficient to support involuntary manslaughter, the conviction had to be reversed.  *Isom*, 906 S.W.2d at 874–75.

■  This court finds *Isom* inapplicable to the instant case.  There was no evidence in *Isom* that the accused shot recklessly.  The accused meant to shoot and intended that the bullet hit the victim.  Shooting someone is an act likely to cause death and, as underscored in *Isom*, a person is presumed to have intended that death follow acts which are likely to produce that result.  906 S.W.2d at 874.

Appellant appears to believe that *Anding* and *Isom* mean a voluntary act can never be the basis of an involuntary manslaughter conviction.  Such a notion is incorrect.

In *State v. Frappier*, 941 S.W.2d 859 (Mo.App. S.D.1997), decided after *Isom*, this court affirmed a conviction of involuntary manslaughter where there was evidence to support a finding that the accused, upon becoming frustrated with his three-month-old son, picked him up by his neck, shook him, and threw him down.  *Id.* at 860.  A doctor who performed an autopsy concluded the victim died from asphyxiation.  *Id.*

This court held it was inferable that the accused did not intentionally choke the child to death, but tried to quiet him by holding his neck and thereby asphyxiated him.  *Id.* at 861.  This court further held a reasonable juror could have found there was a substantial and unjustifiable risk that quieting the child in such a manner would cause his death and that the accused's conscious disregard of that risk was a gross deviation from what a reasonable person would do under the circumstances.  *Id.* Consequently, the evidence was sufficient to support a conviction of involuntary manslaughter.  *Id.* at 862.

*Frappier* was relied on by this court in affirming an involuntary manslaughter conviction in *State v. Ponder*, 950 S.W.2d 900 (Mo.App. S.D.1997).  In that case there was evidence to support a finding that the accused became frustrated with a thirty-three-month-old child and intentionally struck the child or tossed him to the ground to compel him to obey a command to stay away from a fence.  *Id.* at 902, 906–08.  A pathologist concluded the victim died because of a brain injury resulting from "closed head blunt trauma."  *Id.* at 904.

This court held the jury could have reasonably found that by hitting a child of the victim's age and size on the head (and perhaps shaking him violently or tossing him away from the fence), the accused consciously disregarded a substantial and unjustifiable risk that he would cause the child's death, and such disregard was a

gross deviation from what a reasonable person would do in such circumstances. *Id.* at 908–09. That being so, the trial court did not err in giving the jury a verdict-directing instruction on involuntary manslaughter. *Id.* at 909.

■ *Frappier* and *Ponder* are like the instant case in that no one other than the culprit and the victim was present when the fatal trauma occurred. Additionally, the version of § 565.024 in force when the crimes in *Frappier* and *Ponder* occurred is the same version in force when Jessica was fatally injured. Both *Frappier* and *Ponder* stand for the proposition that an individual commits involuntary manslaughter if he or she, without intending to kill the victim or cause the victim serious physical injury, intentionally inflicts trauma that causes the victim's death, where: (a) the accused's conduct creates a substantial and unjustifiable risk of death, (b) the accused consciously disregards that risk, and (c) such disregard is a gross deviation from what a reasonable person would do in such circumstances. *Frappier*, 941 S.W.2d at 861–62; *Ponder*, 950 S.W.2d at 908–09.

■ As explained *infra* in this court's discussion of Appellant's third point, there was sufficient evidence to support a finding that Appellant, while not intending to kill Jessica or cause her serious physical injury, intentionally struck Jessica in the abdomen, that such conduct created a substantial and unjustifiable risk of death, that Appellant consciously disregarded that risk, that such disregard was a gross deviation from what a reasonable person would do in such circumstances, and that the blow ruptured Jessica's duodenum, causing her death.

This court therefore rejects Appellant's hypothesis that she could not be convicted of involuntary manslaughter because there was no evidence to support a finding that Jessica's death was caused by a reckless act. Appellant's first point is denied.

Appellant's second point avers Instruction 7 was flawed in that it "allowed the jury to speculate between multiple theories of liability." Appellant points out that paragraph "First" of Instruction 7 hypothesized she caused Jessica's death by striking her in the abdomen, while paragraph "Second" hypothesized Appellant recklessly caused Jessica's death.

Appellant's theory of error, as this court divines it, is that paragraph "First" requires no mental state in regard to the striking, whereas paragraph "Second" hypothesizes Appellant acted recklessly, but fails to identify any act to which the reckless mental state applied. Consequently, says Appellant, "[T]he jury could find the act of striking [Jessica] in the abdomen was completely accidental, done without any mental state whatsoever, but further determine that some other unspecified act of [Appellant] (i.e. failure to obtain prompt medical attention) was reckless." As a result, argues Appellant, "[T]he jury was allowed to attribute recklessness as a mental state to an act that was not charged and which had nothing to do with the charge of striking [Jessica]."

Whatever merit, if any, that might inhere in Appellant's second point is of academic interest only, as the point was not preserved for review.

Rule 28.03 [8] reads, in pertinent part:

"Counsel shall make specific objections to instructions ... considered erroneous. No party may assign as error the giving [of] ... instructions ... unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."

During the instructions conference, Appellant's lawyer voiced sundry objections to Instruction 7, but did not register the complaint set forth in Appellant's second point.

In *State v. Martindale*, 945 S.W.2d 669 (Mo.App. E.D.1997), the accused uttered

---

**8.** References to Rules are to Missouri Rules of Criminal Procedure (1998).

no objection to a second degree murder instruction at trial, but claimed on appeal that the trial court erred in giving it. *Id.* at 671–73. The appellate court held:

"Because defense counsel did not object to the second degree murder instruction at trial, defendant may not 'assign as error the giving' of the instruction. Rule 28.03. A defendant cannot stand idly by, permit the giving of an erroneous instruction, and then benefit from her inaction. We believe that if the revised version of Rule 28.03[9] is to have any effect, the failure to specifically object must constitute a waiver."

*Id.* at 673[2, 3] (citation omitted). *Cf. State v. Brisco,* 934 S.W.2d 335, 336–37[1] (Mo.App. W.D.1996).

Because Appellant failed at trial to make the objection to Instruction 7 which she now presents in her second point, this court holds the point is not preserved for review. *Compare: State v. Reichert,* 854 S.W.2d 584, 601 (Mo.App. S.D.1993).

■ *Ex gratia* review for plain error under Rule 30.20 reveals Instruction 7 caused no manifest injustice or miscarriage of justice. The prosecutor's theory from opening statement through closing argument was that Jessica's death was caused by a blow to her abdomen inflicted by Appellant. The prosecutor presented no evidence to support any other theory. The sole act hypothesized in Instruction 7 was that Appellant struck Jessica in the abdomen. Consequently, Instruction 7, even if unartfully drawn, could not have misled the jury, hence relief under Rule 30.20 is unwarranted.

■ Appellant's final claim of error is that the evidence was insufficient to support the verdict because "there was no evidence that [Appellant] recklessly caused the death of Jessica[.]"

From the argument following the point, this court is uncertain whether Appellant is claiming (a) there was no evidence to support a conviction of involuntary manslaughter, as the evidence supported only a finding that someone committed murder in the second degree, or (b) the evidence was insufficient to support a finding that Appellant struck the fatal blow.

Contention "a" has already been found meritless in this court's denial of Appellant's first point. Therefore, the only issue left is contention "b."

This court holds the evidence sufficient to support a finding that someone struck Jessica in the abdomen Saturday, May 18, 1996, with sufficient force to rupture her duodenum. The evidence was likewise sufficient to support a finding that the culprit was an adult, as the pathologist testified an average ten-year-old child—Craig was ten—would not be strong enough to deliver the fatal blow.

The pathologist concluded the fatal blow occurred between thirty-six and forty-eight hours before Jessica died. The emergency room physician concluded Jessica died shortly before 10:00 p.m. May 19.

The only adults who had contact with Jessica during the crucial time frame were Appellant and Robert. Even if Candice (age fifteen) were considered an adult, she left the house about 7:45 a.m. May 18 and did not see Jessica again until around 8:00 that evening. By then, Jessica was already displaying symptoms of peritonitis. Consequently, the jury could have reasonably found that only Appellant or Robert could have struck the fatal blow.

Robert was in the house May 18 after Appellant left for work around 7:30 a.m. However, Candice and Craig were also there (along with Jessica).

Robert and Candice left around 7:45 for school, where Candice was to board the Six Flags bus. After returning home from

9. The "revised version" of Rule 28.03 to which *Martindale* refers is the version that took effect July 1, 1995. 945 S.W.2d at 673

n. 11. That version remains unchanged. Appellant's trial began April 13, 1998.

that errand, Robert was in the house with Craig and Jessica until he (Robert) left for work around 9:30 a.m. Craig, testifying at trial, said nothing about any incident between Robert and Jessica prior to Robert's departure for work and, as reported earlier, Robert avowed he did not injure Jessica before departing.

The only incident Craig mentioned regarding Jessica was hearing her cry when he stepped out of the shower. That was when Appellant arrived home around 11:30 a.m. and—by her own admission, became angry when Jessica opened the door. Appellant told Roark and Williams that she (Appellant) spanked Jessica and it was possible she (Appellant) struck Jessica in the abdomen.

Robert did not return home until after 8:00 p.m. May 18. By then, according to the pathologist, the fatal blow had already been struck.

There was evidence that Appellant imposed harsh discipline on Jessica. The incident where Appellant spanked Jessica with the bread board a few weeks before her death left bruises noticed by a school psychologist, who notified the Division of Family Services. An investigator examined Jessica and saw "severe bruising to ... the entire buttock area ... from her waist down to the bottom of the buttock area and completely from one side to the other."

It is also noteworthy that Appellant, when questioned by Roark and Williams on May 21, initially denied spanking Jessica since the bread board spanking. However, after further questioning, Appellant admitted spanking Jessica on May 18. Additionally, when Appellant discovered Jessica unconscious and Robert was unable to revive her, Appellant cried, "I'm so sorry, Elizabeth—I'm so sorry."

Having assiduously examined the record, this court holds the evidence sufficient to support a finding that Appellant became "extremely angry" (Appellant's words to Roark and Williams) when Jessica opened the door alone on May 18, and Appellant, in punishing Jessica, inflicted the abdominal blow that ultimately caused Jessica's death. The jurors could have reasonably believed Appellant did not intend to kill Jessica or cause her serious physical injury, but meant to inflict pain to enforce the rule that Jessica was not to open the door alone. The jurors could also have reasonably found (as they obviously did) that Appellant, in striking the blow, created a substantial and unjustifiable risk of death, that Appellant consciously disregarded that risk, and that such disregard was a gross deviation from what a reasonable person would do in such circumstances. Under *Frappier*, 941 S.W.2d at 861–62, and *Ponder*, 950 S.W.2d at 908–09, that constitutes involuntary manslaughter.

Appellant's final point is denied, and the judgment is affirmed.

PARRISH and SHRUM, JJ., concur.

